**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FRANKLIN D. VICKERS, Executor of
the Estate of Martin Wade Vickers,
<u>Plaintiff-Appellant,</u>

v.

No. 95-1391

NASH GENERAL HOSPITAL,
INCORPORATED; JAMES R.
HUGHES, M.D.,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(CA-94-396-5-BO)

Argued: November 2, 1995

Decided: March 13, 1996

Before WILKINSON, Chief Judge, and HALL
and ERVIN, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Hall joined. Judge Ervin wrote a dissenting
opinion.

_____

**COUNSEL**

**ARGUED:** Pamela Suzanne Duffy, June K. Allison, WISHART,
NORRIS, HENNINGER & PITTMAN, P.A., Burlington, North Car-

olina, for Appellant. Kari Lynn Russwurm, CRANFILL, SUMNER & HARTZOG, L.L.P., Raleigh, North Carolina, for Appellee Nash General; Michael W. Mitchell, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P., Raleigh, North Carolina, for Appellee Hughes. **ON BRIEF:** William H. Elam, WISHART, NORRIS, HENNINGER & PITTMAN, P.A., Charlotte, North Carolina, for Appellant. Alene M. Mercer, CRANFILL, SUMNER & HARTZOG, L.L.P., Raleigh, North Carolina, for Appellee Nash General; Samuel G. Thompson, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P., Raleigh, North Carolina, for Appellee Hughes.

_____

**OPINION**

WILKINSON, Chief Judge:

This case requires us to assess the scope of the Emergency Medical Treatment and Active Labor Act ("EMTALA"). 42 U.S.C. § 1395dd. The appellant, Frank Vickers, executor of the estate of Martin Wade Vickers, brought suit against Nash General Hospital and Dr. James R. Hughes, M.D., under both state medical malpractice law and under EMTALA. The district court dismissed the EMTALA claims, concluding that they presented allegations more properly brought in state court as malpractice actions.

We agree with the district court. Upholding appellant's EMTALA claims would eviscerate any distinction between EMTALA actions and state law actions for negligent treatment and misdiagnosis. Under appellant's reasoning, every claim of misdiagnosis could be recast as an EMTALA claim, contravening Congress' intention and this circuit's repeated admonition that EMTALA not be used as a surrogate for traditional state claims of medical malpractice.

I.

Because the complaint was dismissed pursuant to Fed. R. Civ. P. 12(b)(6), we take the facts as alleged to be true. The events giving rise to this litigation began on the night of June 19, 1992, when Martin

2

Wade Vickers was involved in an altercation. During the scuffle, Vickers evidently fell and landed on his head, causing a laceration of his scalp. He arrived at the emergency room of Nash General Hospital at roughly 2:10 A.M. on June 20, 1992.

Vickers was examined in the emergency room by Dr. James R. Hughes. After his examination, Dr. Hughes diagnosed Vickers as suffering from a "laceration and contusions and multiple substance abuse." Dr. Hughes repaired the laceration in Vickers' scalp with staple sutures. Dr. Hughes apparently also ordered that x-rays of Vickers' cervical spine be taken. The x-rays revealed no spinal damage. Vickers remained in the Hospital for approximately eleven hours. At about 1:15 P.M. on June 20, 1992, he was discharged, with directions to return in ten days for removal of the staple sutures. He was also instructed to report to the mental health department in two days, on June 22, 1992.

On the morning of June 24, 1992, four days after his discharge from the Hospital, paramedics responded to an emergency call regarding Vickers. When emergency personnel found him, he was not breathing and lacked a discernible pulse. They then rushed Vickers to the Hospital emergency room. Efforts to resuscitate Vickers failed, however, and he was pronounced dead at 9:15 A.M. An autopsy identified the cause of death as cerebral herniation and epidural hematoma produced by a fracture of the left parietal area of Vickers' skull.

Frank Vickers, executor of the decedent's estate, initiated several causes of action against the Hospital and Dr. Hughes. He alleged that Vickers received negligent treatment, because the laceration should have prompted testing for intracranial injury which would have revealed the skull fracture. He also alleged that the Hospital violated EMTALA by failing both to provide an appropriate screening examination and to stabilize Vickers' condition. The district court dismissed the EMTALA claims under Fed. R. Civ. P. 12(b)(6). While the Hospital's treatment of Vickers "may constitute negligence and malpractice," the court determined, "it is not enough, standing alone, to constitute a violation of EMTALA." The district court then also dismissed the supplemental state law negligence actions for lack of jurisdiction, expressly allowing for refiling of those claims in state court. This appeal followed.

II.

Congress enacted EMTALA in 1986 "to address a growing concern with preventing `patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized." Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir. 1994). The Act accordingly imposes two principal obligations on hospitals. First, it requires that when an individual seeks treatment at a hospital's emergency room, "the hospital must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition" exists. 42 U.S.C. § 1395dd(a). Second, if the screening examination reveals the presence of an emergency medical condition, the hospital ordinarily must "stabilize the medical condition" before transferring or discharging the patient. 42 U.S.C.§ 1395dd(b)(1).[1]

The Act thereby imposes a "limited duty on hospitals with emergency rooms to provide emergency care to all individuals who come there." Brooks v. Maryland General Hosp., Inc., 996 F.2d 708, 715 (4th Cir. 1993). The duty created by EMTALA is a"limited" one in a very critical sense: "EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." Power, 42 F.3d at 856. We have frequently reaffirmed this limit on the Act's scope. Id. at 869 (Ervin, C.J., concurring in part and dissenting in part) ("Virtually every decision addressing EMTALA has recognized that Congress did not intend for the Act to be a substitute for a state medical malpractice action."); Brooks, 996 F.2d at 710 ("The Act was not designed to provide a federal remedy for misdiagnosis or general malpractice."); Baber v. Hospital Corp., 977 F.2d 872, 880 (4th Cir. 1992) ("EMTALA is no substitute for state law medical malpractice actions.").

_____

[1] In certain circumstances, EMTALA allows hospitals to transfer individuals to other facilities before stabilizing their condition (such as if the benefits from treatment at the alternate facility outweigh the risks of transfer). See 42 U.S.C. § 1395dd(c). None of these circumstances are at issue in this case.

4

In general, "[q]uestions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery." Baber, 977 F.2d at 880. The other circuit courts are universally in accord on the need to distinguish EMTALA claims from standard claims of negligence and misdiagnosis -- EMTALA "is not intended to duplicate preexisting legal protections, but rather to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat." Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991); see Correa v. Hospital San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995) ("EMTALA does not create a cause of action for federal malpractice."); Summers v. Baptist Medical Ctr. Arkadelphia, 69 F.3d 902, 904 (8th Cir. 1995) ("EMTALA is not a federal malpractice statute and it does not set a national emergency health care standard; claims of misdiagnosis or inadequate treatment are left to the state malpractice area."); Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1258 (9th Cir. 1995); Repp v. Andarko Mun. Hosp., 43 F.3d 519, 522 (10th Cir. 1994) (EMTALA"`is neither a malpractice nor a negligence statute.'") (citation omitted); Holcomb v. Monahan, 30 F.3d 116, 117 (11th Cir. 1994) (EMTALA "is not designed to redress a negligent diagnosis by the hospital; no federal malpractice claims are created."). In evaluating appellant's claims under EMTALA, then, we must bear in mind that the Act does not provide a cause of action for routine charges of misdiagnosis or malpractice.

III.

Appellant contends that the Hospital failed both to provide an "appropriate screening examination" to Vickers, 42 U.S.C. 1395dd(a), and to "stabilize" Vicker's medical condition before discharging him, 42 U.S.C. 1395dd(b). An examination of both allegations reveals, however, that they ultimately present conventional charges of misdiagnosis, and that their reasoning would obliterate any distinction between claims of malpractice under state law and actions under EMTALA. We thus agree with the district court that appellant's allegations fail to make out a claim under the Act. **2**

_____
**2** Although the district court ruled on a motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6), some of its language was sugges-

5

A.

EMTALA's requirement that individuals seeking emergency care receive an "appropriate screening examination" obligates hospitals to "apply uniform screening procedures to all individuals coming to the emergency room." Matter of Baby K, 16 F.3d 590, 595 (4th Cir.), cert. denied, 115 S. Ct. 91 (1994); see Baber, 977 F.2d at 879. The screening provision, "at the core," thus "aims at disparate treatment." Brooks, 996 F.2d at 713. Appellant attempts to assert a violation of this requirement by alleging that Vickers "received less screening, both in quantity and quality, than required under the Act, and less than those other patients presenting in this same medical condition received."

On the surface, this allegation may seem to state a claim under EMTALA's screening provision -- the charge that Vickers received less treatment than "other patients presenting in this same medical condition" invokes the language of disparate treatment, the linchpin of an EMTALA claim. The argument runs essentially as follows: Vickers arrived at the emergency room with a "severe" laceration of his scalp; patients who suffer from such severe head injuries normally undergo diagnostic testing for intracranial injury; because Vickers received only staple sutures but not testing for intracranial injury, he was treated disparately from other individuals presenting in the same medical condition.

This line of argument, however, ignores the distinction between the initial screening examination, the focus of EMTALA, and the correct-ness of the treatment that follows from the screening. EMTALA requires a screening examination "to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. 1395dd(a). Here, Dr. Hughes did screen Vickers upon his arrival at the emergency room. As a result of this screening, Dr. Hughes determined that Vick-

_____

tive of a ruling on summary judgment. The court, though, expressly acknowledged that it was ruling on a motion to dismiss. Although the court's language may not have been tidy, this is not dispositive. Instead, we must ask whether, after taking the facts in the complaint to be true, appellant makes out a claim under EMTALA.

ers suffered from a "laceration and contusions and multiple substance abuse." Pursuant to this diagnosis, Dr. Hughes treated the laceration with staple sutures. Of course, had Dr. Hughes diagnosed Vickers as suffering from more severe head injuries, he may well have ordered diagnostic testing for intracranial injury. But the accuracy of the diagnosis is a question for state malpractice law, not EMTALA; the Act "does not impose any duty on a hospital requiring that the screening result in a correct diagnosis." Brooks, 996 F.2d at 711; Baber, 977 F.2d at 879. Instead, "questions related to . . . diagnosis remain the exclusive province of local negligence and malpractice law." Gatewood, 933 F.2d at 1039.

Appellant simply ignores this basic principle. Instead, he assumes that Dr. Hughes should have diagnosed Vickers differently (and in hindsight perhaps more accurately) as suffering the sort of severe head injury that requires testing for intracranial damage. He then asserts the obvious proposition that this diagnosis would have prompted different treatment than Vickers in fact received. But if disparate treatments based on disparate diagnoses sufficed to raise a claim under EMTALA, every allegation of misdiagnosis could automatically be recast as a claim under the Act: An improperly diagnosed patient can always assert that a properly diagnosed patient would have received a different course of treatment. See Summers, 69 F.3d at 905 (Arnold, C.J., dissenting). Such an outcome would plainly subvert Congress' intent that EMTALA remain distinct from state malpractice law.

The flaw in this reasoning is its failure to take the actual diagnosis as a given. EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment; it is not implicated whenever individuals who turn out in fact to have had the same condition receive disparate treatment. See Baber, 977 F.2d at 885. The Act would otherwise become indistinguishable from state malpractice law. As a result, when an exercise in medical judgment produces a given diagnosis, the decision to prescribe a treatment responding to the diagnosis cannot form the basis of an EMTALA claim of inappropriate screening. See Power, 42 F.3d at 858 ("Ignoring . . . variations in the exercise of medical judgment would be inconsistent with the intent of the appropriate screening provision of EMTALA."). In fact, not only does treatment based on diag-

7

nostic medical judgment not violate the Act, it is precisely what EMTALA hoped to achieve -- handling of patients according to an assessment of their medical needs, without regard to extraneous considerations such as their ability to pay. See Brooks, 996 F.2d at 711.

This circuit's opinion in Baber, 977 F.2d at 872, makes clear that disparate treatment of individuals perceived to have the same condition is the cornerstone of an EMTALA claim, and that treatment decisions based on medical judgment consequently fall outside the Act. In the strikingly similar facts of that case, the patient suffered a laceration of her scalp, a physician examined the wound and elected to treat it with sutures, and the patient ultimately died from a subdural hematoma and a fracture of her skull. As here, the plaintiff alleged that x-rays of the skull would have identified the fracture, and failure to do so violated EMTALA's screening requirement.

This court rejected the plaintiff's argument, observing that "Ms. Baber was initially screened and evaluated in [the hospital's] emergency department." Id. at 881. In the doctor's "medical judgment," it reasoned, the "head injury was not serious and did not indicate the need at that time for a CT scan or x-rays." Id. The court acknowledged that "Ms. Baber's condition may have been misdiagnosed originally," but determined that "there is no evidence demonstrating that the hospitals or physicians failed to treat her." Id. at 885. Instead, the doctor "treated Ms. Baber for what he perceived to be her medical condition." Id. (emphasis added). This, the court found, was sufficient to defeat the EMTALA claim of inappropriate screening.

The same analysis must apply in this case.3 Dr. Hughes treated

_____

**3 Baber** upheld an award of summary judgment, whereas here we consider an appeal from a dismissal under Fed. R. Civ. P. 12(b)(6). And in Baber the plaintiff did not specifically allege disparate treatment in his complaint, while here appellant did use the term"disparate treatment." But mechanical invocation of the phrase "disparate treatment" does not convert appellant's allegations of misdiagnosis into a valid claim under EMTALA, when in substance the allegation is no different from the claim in Baber. The District of Columbia Circuit, for example, did not hesitate to affirm a dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim under EMTALA when the allegation was one of misdiagnosis. Gatewood, 933 F.2d at 1037.

Vickers for what he "perceived to be" Vickers' medical condition. In his medical judgment, like that of the physician in Baber, the laceration did not warrant testing for intracranial injury. Dr. Hughes instead treated the laceration with sutures. He also ordered x-rays of Vickers' cervical spine, and kept him in the Hospital for a period of eleven hours before releasing him. In light of the substantial medical attention paid to Vickers, the circumstances are far afield from those that concerned Congress in enacting EMTALA. And while the reasonableness of Dr. Hughes' medical conclusions may well be called into question, this is the province of state malpractice law; negligence claims under state law are in fact pending. In sum:

> Whether any of the defendants acted negligently is a question of medical malpractice which may be addressed in a state court action. It is enough for purposes of EMTALA that none of the evidence demonstrates an attempt . . . to `dump' [the patient]; instead hospital personnel treated [him] for what they perceived to be [his] medical condition."

Id. Because appellant does not allege that Vickers received different treatment than other patients perceived to have the same medical condition, he fails to state a claim of inappropriate screening under EMTALA.

B.

Appellant's charge that the Hospital failed to "stabilize" Vicker's condition before discharging him fails for largely the same reasons. EMTALA requires that when a hospital "determines that [an] individual has an emergency medical condition," the hospital must provide for such further examination and treatment "as may be required to stabilize the condition." 42 U.S.C. 1395dd(b)(1). On its face, this provision takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions that they actually detect. See Baber, 977 F.2d at 883; see also Eberhardt, 62 F.3d at 1259; Gatewood, 933 F.2d at 1041. Accordingly, Baber emphasized that a stabilization claim exists when "the patient had an emergency condition" and "the hospital actually knew of that condition." Baber, 977 F.2d at 883 (emphasis added). The Act does not hold hospitals accountable for failing to sta-

9

bilize conditions of which they are not aware, or even conditions of which they should have been aware. Id. EMTALA would otherwise become coextensive with malpractice claims for negligent treatment.

Appellant's claim misconstrues the nature of the stabilization requirement. It alleges that Vickers presented to the Hospital suffering from an "emergency medical condition," that the Hospital "did not take further steps to examine or treat [Vickers] or in any way attempt to stabilize his emergency medical condition," and that the Hospital's discharge violated EMTALA because Vickers' "emergency medical condition had not been stabilized." This charge fails once again to take the actual diagnosis as a given. Dr. Hughes diagnosed Vickers as suffering from a laceration, and repaired the laceration with staple sutures. The assertion that the Hospital did not "in any way attempt to stabilize" Vickers' condition is thus in error, at least as regards the condition of which the Hospital was actually aware.

Appellant's claim instead relates to the condition which, in hindsight, Vickers turned out to have -- a severe fracture of his skull which caused a cerebral hematoma -- and alleges that the Hospital failed to take adequate steps to stabilize that condition. "Analysis by hindsight," however, "is not sufficient to impose liability under EMTALA." Baber, 977 F.2d at 883. Instead, a hospital must actually perceive the seriousness of the medical condition and nevertheless fail to act to stabilize it. Appellant makes no such allegation in this case.

Here, Vickers received sutures for his laceration. He also received x-rays of his cervical spine. He was kept in the Hospital for eleven hours before discharge. Four days later, he died. In light of this lamentable outcome, both the diagnosis and treatment may form the basis of state malpractice claims. Failure to stabilize claims under EMTALA are different, however, as "Congress deliberately left the establishment of malpractice liability to state law, limiting EMTALA's role to imposing on a hospital's emergency room the duty . . . to stabilize any emergency condition discovered." Brooks, 996 F.2d at 711.

IV.

The facts as alleged in the complaint are that defendants diagnosed a scalp laceration and treated it. Because appellant's claims are at bot-

tom ones of misdiagnosis, and because misdiagnosis must remain, as Congress intended, a matter of state malpractice law, we affirm the judgment of the district court.

AFFIRMED

ERVIN, Circuit Judge, dissenting:

I respectfully dissent.

The majority provides a thorough analysis of Congress's purpose in enacting EMTALA, and although correct about the statute's goals, the opinion wrongly faults Vickers for congressional imprecision. The majority's real problem is not with what Vickers alleged, but with the statutory language, which allows an EMTALA violation to be proven even when the failure to screen or stabilize is not shown to have been based on an economic motive. Although EMTALA was designed to end patient dumping, Congress did not specify that EMTALA claims must include proof of an economic motive. Regardless of what we divine the congressional intent to have been, the statute is perfectly clear about what a plaintiff must allege in order to state a claim.

The Federal Rules of Civil Procedure establish a notice-pleading system. Complaints should be dismissed for failure to state a claim on which relief can be granted only when, construing all allegations in the light most favorable to the plaintiff, it is clear that no set of facts could be proven under which the plaintiff would be entitled to relief. Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984). Vickers alleges that Nash Hospital "did not provide Plaintiff Martin with an appropriate medical screening examination" as required by EMTALA. Specifically, the complaint alleges that Martin "received less screening, both in quantity and quality, than required under the Act, and less than those other patients presenting in this same medical condition received." The complaint also alleges that the Hospital discharged Martin "in violation of 42 U.S.C. 1395dd(b) as Plaintiff Martin's emergency medical condition had not been stabilized . . . ." Vickers has effectively put Nash General Hospital on notice that he is charging them with inadequate screening and failure to stabilize under EMTALA. He has not provided specific facts in support of these alle-

11

gations and may very well ultimately fail in his attempt. But I believe the district court erred in dismissing the claim under Rule 12(b)(6).

The majority--after recognizing that disparate treatment is the "cornerstone" of an EMTALA claim--simply states that "mechanical invocation of the phrase" cannot "convert appellant's allegations of misdiagnosis into a valid claim under EMTALA." Supra n.3. But many, if not most, of the allegations made in complaints written in the notice-pleading fashion could be read as mechanical invocations of the phrases and elements used to establish particular claims.

Comparing the present case to Baber is unavailing. As the majority recognizes, that case was decided on summary judgment, and the decision was premised on the plaintiff's failure to provide evidence of disparate treatment. This is a very different standard than that used to evaluate a motion to dismiss for failure to state a claim. The factual similarity of the two cases thus means very little in the present posture of this case.

Vickers has alleged enough to allow him to undertake discovery. This particular plaintiff ought not to be penalized for Congress's failure to statutorily define how EMTALA differs from a medical malpractice claim under state law.

For these reasons, I would reverse the district court's dismissal under Rule 12(b)(6) and remand for further proceedings.

12