**Carol E. BOHANNON, Plaintiff,**

v.

**DURHAM COUNTY HOSPITAL CORPORATION, D/B/A Durham Regional Hospital, Defendant.**

No. 4:97CV01008.

United States District Court,
M.D. North Carolina.

Oct. 26, 1998.

Maria C. Scanga, Joan M. Mitchell, Research Triangle Park, NC, for Plaintiff.

Timothy P. Lehan, Michael W. Mitchell, Raleigh, NC, for Defendant.

## MEMORANDUM OPINION

TILLEY, District Judge.

Plaintiff, Carol E. Bohannon, filed a complaint against Defendant, Durham County Hospital Corporation, d/b/a Durham Regional Hospital ("DRH"), alleging that DRH violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. Plaintiff alleges three counts: Count One, that on his initial visit to the hospital on October 8, 1995, DRH failed to "provide for an appropriate medical screening examination" as required by § 1395dd(a); Count Two, that during this initial visit DRH failed to properly "stabilize the medical condition" as required by § 1395dd(b)(1)(A); and Count Three, that on a second visit to the hospital later that night, DRH again failed to properly stabilize his condition in violation of § 1395dd(b)(1)(A).

Pursuant to Fed.R.Civ.P. 12(b)(6), DRH has filed a Motion to Dismiss for failure to state a claim upon which relief can be granted for Counts One and Two. DRH has indicated that it intends to address Count Three

by means of a summary judgment motion. (Def.'s Br. Supp. Mot. Dismiss [Doc. # 9], at 2–3.) Because the Complaint sufficiently alleges a claim upon which relief can be granted for failure to provide an appropriate screening examination, Defendant's Motion to Dismiss Count One is DENIED. However, because DRH failed to discover the broken neck and had no duty to stabilize a medical condition of which it was unaware at the time the Plaintiff was discharged, Defendant's Motion to Dismiss Count Two is GRANTED.

## I.

"[A] rule 12(b)(6) motion should be granted only in very limited circumstances." *Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir.1989). In appraising the sufficiency of a complaint, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Rule 12(b)(6) must be read consistently with the liberal pleading standards set forth in Rule 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); *see Bolding v. Holshouser*, 575 F.2d 461, 464 (4th Cir.1978), *cert. denied*, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978). Thus, "detailed factual averments are no longer necessary to avoid dismissal of a claim." *Bolding*, 575 F.2d at 464. Furthermore, in reviewing a Rule 12(b)(6) Motion to Dismiss, the Plaintiff's allegations must be taken as true. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). Taking the Plaintiff's facts alleged in the Complaint as true, the events giving rise to this litigation are as follows.

On Saturday, October 7, 1995, Plaintiff was involved in a motorcycle accident. (Compl. [Doc. # 1] ¶ 4.) On Sunday, October 8, 1995 at 4:30 p.m., Plaintiff arrived at the emergency room at DRH complaining of an ankle laceration, eye pain, stiffness in his upper body, and numbness in his right side and extremities. (*Id.* ¶¶ 4, 5.) Plaintiff complained of severe pain and requested pain medication. (*Id.* ¶ 6.) In the emergency room, Plaintiff was examined by Kelli Shell, a physician's assistant at DRH. (*Id.* ¶ 7.) The Plaintiff was agitated that he was seen by a physician's assistant rather than a "real doctor" and repeatedly demanded to see a doctor. (*Id.* ¶ 7.) Plaintiff informed Kelli Shell that he was uninsured, and Plaintiff's chart included notations that he was "toothless and disheveled." (*Id.* ¶¶ 15(A), 16.)

During his emergency visit, Plaintiff received treatment of his leg and eye wounds, and was given a soft neck collar, an arm sling, and a prescription for pain medication. (*Id.* ¶ 8.) Additionally, x-rays were taken of his upper torso; however, Kelli Shell discharged the Plaintiff before his x-rays had been evaluated. (*Id.* ¶ 8.) Although, DRH contests this allegation (Def.'s Br. Supp. Mot. Dismiss [Doc. # 9], at 4), for the purposes of this motion, it will be taken as true that DRH did not review the x-rays until after Plaintiff's discharge.

Later that same night, Kelli Shell called the Plaintiff to inform him that, having reviewed his x-rays after his discharge, DRH believed that he had a broken neck. (Compl. [Doc. # 1] ¶ 9.) Plaintiff was advised to return to the emergency room for stabilization and treatment, and was warned that a wrong movement could result in paralysis. (*Id.* ¶ 9.) When Plaintiff returned to the hospital, he was diagnosed with a broken neck and was given a Philadelphia collar. (*Id.* ¶ 10.) Ultimately, Plaintiff sought treatment from Duke Hospital, where he underwent surgery for his condition. (*Id.* ¶ 11.)

## II.

Plaintiff brought suit against DRH alleging that DRH violated EMTALA by failing to evaluate his x-rays and diagnose his condition before he was discharged, and by failing to stabilize his broken neck during his initial emergency room visit and during his second visit later that night. Plaintiff claims that DRH treated him disparately from other patients because of his physical appearance and lack of medical insurance.

■ "Congress enacted EMTALA to address a growing concern with preventing 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized." *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir.1994). To effectuate this purpose, EMTALA imposes certain obligations upon a hospital. The Act contains a medical screening requirement that if an individual seeks treatment at an emergency room, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition ... exists." 42 U.S.C. § 1395dd(a). The Act further requires that if "the hospital determines that the individual has an emergency medical condition, the hospital must provide ... within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition." *Id.* § 1395dd(b).

## III.

■ Count One alleges that DRH denied Plaintiff an appropriate screening examination. Although EMTALA requires an "appropriate medical screening examination," it "does not define that term other than to state its purpose is to identify an 'emergency medical condition.'" *Baber v. Hospital Corp. of America*, 977 F.2d 872, 879 (4th Cir.1992). The Fourth Circuit has held that, "[t]he plain language of the statute requires a hospital to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints." *Id.* (footnote omitted). However, "while EMTALA requires a hospital emergency department to apply its standard screening examination uniformly, it does not guarantee that the emergency personnel will correctly diagnose a patient's condition as a result of this screening." *Id.* Thus, the Act does not impose a minimum standard of care, but rather only obligates the hospital to provide uniform care to all patients. *See id.*

Plaintiff first claims that DRH violated EMTALA by failing to diagnose his broken neck before his discharge. (Compl. [Doc. # 1] ¶ 15(A).) The Fourth Circuit has consistently held that "[t]he Act does not impose any duty on a hospital requiring that the screening result in a correct diagnosis." *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 711 (4th Cir.1993); *see also Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 143 (4th Cir.1996). As stated in *Brooks*, the Fourth Circuit has "noted previously that EMTALA is not a malpractice statute and its 'avowed purpose ... was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care.'" *Brooks*, 996 F.2d at 711 (quoting *Baber*, 977 F.2d at 880). Although the Plaintiff here may have a state malpractice action for failure to diagnose his broken neck during his initial visit, he does not have a federal claim under EMTALA.

■ Second, Plaintiff claims that DRH treated him disparately because he was uninsured and had a disheveled appearance. (Compl. [Doc. # 1] ¶¶ 15(A), 16.) Plaintiff can prevail under EMTALA if he is able to show that DRH treated him disparately from other patients perceived to have his same condition. Given the liberal pleading standards set forth by the Fourth Circuit in *Bolding*, Plaintiff's Complaint sufficiently alleges a claim of disparate treatment to survive a Motion to Dismiss. "[A] claim under EMTALA need only allege that ... a hospital's emergency room failed to screen the plaintiff or did not apply the same standard of screening to the plaintiff that it applies to other patients ...." *Brooks*, 996 F.2d at 713.

In his Complaint, Plaintiff alleges that Defendant hospital knew that he was uninsured (Compl. [Doc. # 1] ¶¶ 15(A), 16), and that "his inadequate screening in the emergency room was a direct result of his disclosing his lack of medical insurance to the first physician's assistant who examined him, Kelli Shell" (*Id.* ¶ 16). Plaintiff also alleges that his "appearance and his lack of medical insurance resulted in this disparate treatment

which violates the policy of EMTALA." (*Id.* ¶ 16.)

Plaintiff arrived at DRH at 4:30 p.m. on Sunday, October 8 for emergency treatment complaining of stiffness in his upper body and numbness in his right side and extremities. (*Id.* ¶ 5.) DRH took x-rays of his upper torso and provided him with a soft collar and pain medication, but did not review his x-rays until after he was discharged. (*Id.* ¶¶ 8, 15(A).) Later that same night, Kelli Shell called him to inform him that his x-rays suggested he had a broken neck. (*Id.* ¶ 9.) Although Plaintiff does not explicitly state that DRH failed to adhere to its standard screening procedures in examining him, he does sufficiently allege facts to support his allegation that he was treated differently from other patients perceived to have a neck or spinal injury.

■ According to *Vickers*, "disparate treatment of individuals perceived to have the same condition is the cornerstone of an EMTALA claim." *Vickers*, 78 F.3d at 144. "EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment; it is not implicated whenever individuals who turn out in fact to have had the same condition receive disparate treatment." *Id.* Thus, DRH's perception of the Plaintiff's injury is relevant in determining what kind of treatment was required under EMTALA.

In *Vickers*, a patient went to the emergency room with a head laceration. *Id.* at 141. The doctor repaired the laceration with staple sutures and discharged the patient without testing for intracranial injury. *Id.* Four days after his discharge, the patient died from a cerebral herniation and epidural hematoma, both of which would have been discovered if proper testing had been done. *Id.* The executor of the decedent's estate brought an EMTALA claim against the hospital alleging that the hospital failed to provide an appropriate medical screening examination. *Id.* at 141–42. The plaintiff alleged that the patient "received less screening, both in quantity and quality, than required under the Act, and less than those other patients presenting in this same medical condition received." *Id.* at 143.

The Fourth Circuit dismissed the plaintiff's claim, holding that "[b]ecause appellant does not allege that Vickers received different treatment than other patients perceived to have the same medical condition, he fails to state a claim of inappropriate screening under EMTALA." *Id.* at 145. The court found that the hospital treating Vickers only perceived Vickers to have a surface head laceration and not an intracranial injury. *Id.* at 144. Since lacerations would not normally warrant testing for intracranial injury, and since the plaintiff did not allege that the hospital treated the decedent differently from other patients perceived to have head lacerations, there was no violation of EMTALA. *Id.* at 144–45.

■ Here, Plaintiff arrived at DRH in pain, with stiffness in his upper body and with numbness in his side and extremities. DRH took x-rays of the Plaintiff's upper torso, thereby implying that DRH perceived that Plaintiff might have an injury to his neck or spine. The issue is whether DRH had a policy that all x-rays of patients perceived to have neck or spinal injuries must be reviewed before the patient is discharged. Plaintiff has sufficiently raised a claim that it was not uniform procedure for DRH to review x-rays after a patient had been discharged. Nevertheless, to prevail at trial, Plaintiff will bear the burden of showing that DRH had a standard procedure of reviewing all x-rays prior to discharge, and that it treated him differently from others perceived to have his same condition. *See Power*, 42 F.3d at 858–59.

### IV.

■ Count Two alleges that DRH violated EMTALA by failing to stabilize his broken neck before he was discharged from his first visit to the hospital. Because DRH was unaware of Plaintiff's broken neck when he was discharged the first time, the hospital did not violate EMTALA. The Act requires that if "the hospital determines that the individual has an emergency medical condition, the hospital must provide . . . such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1). Thus,

actual discovery of the condition is a prerequisite to the requirement of stabilization. "The Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." *Vickers,* 78 F.3d at 145 (citing *Baber,* 977 F.2d at 883).

In *Vickers,* the Fourth Circuit held that since the hospital had not discovered the intracranial injury prior to discharge, it did not violate EMTALA by failing to stabilize the condition. *Id.* The Fourth Circuit pointed out that "[o]n its face, this provision takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions that they actually detect." *Id.* Since the hospital in *Vickers* had not detected the cerebral hematoma, it was not required to stabilize it.

Taking the facts alleged in the Complaint as true, DRH failed to diagnose Plaintiff's broken neck during his first visit and discovered the broken neck upon examining his x-rays after his discharge. (Compl. [Doc. #1] ¶¶ 8, 9, 15(A).) Since DRH was not aware that Plaintiff had a broken neck when it discharged him the first time, it did not violate EMTALA by failing to stabilize his condition.

## V.

Because Plaintiff sufficiently stated a claim that DRH failed to provide an appropriate screening examination by failing to review his x-rays prior to discharge, it is ORDERED that DRH's Motion to Dismiss Count One is denied. Because DRH had no duty under the Act to stabilize a condition of which it was unaware, it is ORDERED that DRH's Motion to Dismiss Count Two is granted.

## ORDER

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Order, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss Count One, that Defendant failed to provide an appropriate screening examination, is DENIED. Furthermore, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss Count Two, that Defendant failed to stabilize Plain-

tiff's broken neck during his initial visit to the hospital, is GRANTED.