Leslie CAMP, Individually and as Appellants Representative of the Estate of Karen Gothard Camp, Paul M. King, Mavis King, and Donald Gothard, Appellants,

v.

HARRIS METHODIST FORT WORTH HOSPITAL, Appellee.

No. 2–97–106–CV

Court of Appeals of Texas, Fort Worth.

Dec. 31, 1998.

Charles L. Caperton, James E. Girards, and David Weiner, Dallas, for Appellant.

Cooper, Aldous and Scully, P.C., R. Brent Cooper and Michelle E. Robberson, Dallas, for Appellee.

Before DAY, DAUPHINOT, and BRIGHAM, JJ.

## OPINION

SAM DAY, Justice.

### I. INTRODUCTION AND PROCEDURAL HISTORY

Leslie Camp, individually and as representative of the estate of Karen Gothard Camp, Paul M. King, Mavis King, and Donald Gothard[1] appeal from an adverse judgment on their claims under the federal Emergency Medical Treatment and Active Labor Act (EMTALA).[2] Originally, appellants sued Harris Methodist Fort Worth Hospital (the Hospital) and Drs. Scott Plantz and Robert Keller for medical malpractice and EMTALA violations. But appellants nonsuited their claims against Dr. Plantz and settled and dismissed their claims against Dr. Keller. Appellants proceeded to trial only on their EMTALA claims against the Hospital. The jury returned a verdict adverse to appellants, and the trial court rendered judgment on the verdict. This appeal followed.

In five points, appellants complain that the trial court erred by failing to disregard the unfavorable jury findings, failing to grant appellants' motion for new trial, and excluding certain evidence. We affirm.

### II. BACKGROUND FACTS

On October 12, 1992, Leslie drove Karen to the Hospital in hope that she could get some relief from the severe shoulder pain she was experiencing. Karen, who had injured her shoulder in 1990, had been under the care of Dr. Keith Watson, an orthopedic surgeon. The Camps believed Dr. Watson would be available at the Hospital.

At the Hospital's emergency room, Karen was initially seen by Carol Reynolds, a nurse. Reynolds documented Karen's complaint of severe shoulder pain and also noted that her appearance was pale or sallow. Karen's vital signs (pulse, blood pressure, respiration) were somewhat, but not markedly, abnormal, and they were not consistent with a patient who is unstable. Reynolds heard "crackles" when she listened to Karen's lungs, which can be a sign of heart failure. Also, Karen mentioned that she had some anemia. Reynolds elevated Karen's head and provided her oxygen to ease her discomfort. Reynolds did not believe Karen was in acute distress.

Then Karen was examined by Dr. Plantz, a physician in the Hospital's emergency room. Dr. Plantz ordered several lab tests for Karen, including a complete blood count. The blood test revealed that Karen had a very low hemoglobin level. The lab tests also indicated acidosis, which can be a sign of insufficient oxygen delivery to body tissues. Dr. Plantz recognized that these test results were abnormal, and he thought Karen needed a work-up to determine why her hemoglobin and hematocrit were so low.

After reviewing the test results, Dr. Plantz contacted Dr. Watson about Karen's shoulder pain and also informed Dr. Watson that Karen looked pale, and her blood tests showed significant anemia, but she had no blood in her stool. The doctors decided that Dr. Keller, an internist, should be consulted. Dr. Plantz called Dr. Keller and told him about Karen's lab test results. Dr. Plantz related that the test results indicated Karen had chronic anemia, but she had no signs or symptoms of acute bleeding, and she knew she was anemic.[3] Dr. Plantz also assured Dr. Keller that Karen was stable medically and did not want to be admitted to the hospital. Drs. Plantz and Keller eventually agreed that Karen could be discharged from the Hospital with instructions to call Dr. Keller's office at 8:30 or 9:00 the next morning for an appointment. Based on his discussion with Dr. Plantz, Dr. Keller agreed that Karen had stable, chronic anemia, which was not an emergency medical condition, so that follow-up treatment could wait until early the next day.

---

1. Leslie Camp is Karen Camp's surviving spouse; Paul and Mavis King are Karen's parents; and Donald Gothard is Karen's son. In this opinion, we refer to them collectively as "appellants" and individually by their names.

2. EMTALA is codified at 42 U.S.C.A. § 1395dd (West Supp.1998).

3. Acute bleeding would have indicated an acute—rather than chronic—problem. A chronic condition is one the patient has had for a long time, while an acute condition is new or recent. Appellants' expert also testified that Karen's anemia was chronic and that she did not appear to have exhibited any acute symptoms.

There is conflicting evidence regarding what Dr. Plantz communicated to the Camps about Karen's condition. Dr. Plantz testified: after reviewing Karen's test results, he told her about them, that she needed a work-up for anemia, and that she would risk dying if she left the hospital. Dr. Plantz did not remember talking to Leslie about this. Karen was worried about receiving a blood transfusion, and she opposed being admitted to the hospital. Dr. Plantz did not document Karen's alleged concerns in her hospital chart. After talking with Dr. Keller, Dr. Plantz again told Karen that she should be admitted to the hospital, but if she insisted on not being admitted, her alternative was to see Dr. Keller at 9:00 the next morning. Karen agreed to see Dr. Keller the next morning, and Dr. Plantz believed Karen would keep the appointment. Also, although death was a risk, it was not a certainty; Dr. Plantz considered Karen to be medically stable throughout her stay in the emergency room. Therefore, Dr. Plantz discharged Karen from the Hospital.

Leslie testified: Dr. Plantz examined Karen only once and ordered blood work. No one said anything about Karen needing additional treatment, and Karen never refused any. However, Leslie admitted that Dr. Plantz could have told the Camps things that Leslie did not recall. A nurse told the Camps that it was a miracle Karen was alive because of her low hemoglobin level. The nurse also presented Karen with discharge papers. The nurse told Karen she needed to see a blood specialist the next day, that the hospital staff had arranged for an appointment with Dr. Keller, and that Karen should call and set up an appointment at 9:00 the next morning. The Camps promised to keep the appointment with Dr. Keller and signed the discharge papers.

The Camps left the hospital and returned home. Early the next morning, Leslie went to work. Karen did not make or keep an appointment with Dr. Keller because she was afraid her workers' compensation insurance would not cover it. Sometime between 9:00 and 10:30 a.m., Karen called Leslie, panicked because she'd just telephoned Dr. Watson, who had told her to get to a hospital immediately or she might die.[4] Leslie promised he would be home as soon as he finished some paperwork. While Leslie was still at work, he received a call from the sheriff's office, telling him that Karen was being taken to Mesquite Medical Center. The doctors at Mesquite Medical Center told Leslie that Karen had internal bleeding and would probably die. Karen died around noon that day.

The medical examiner who performed an autopsy on Karen concluded that her death was caused by heart failure due to chronic anemia—most likely due to blood loss from a gastric ulcer. However, the stool test done in the emergency room was negative, and nothing in the autopsy report indicated any active gastrointestinal bleeding. A toxicology screen showed several prescription medications in Karen's bloodstream,[5] but the medical examiner ruled out the medications as a cause of death because they were all at therapeutic or low levels.

Conversely, the Hospital's toxicology expert opined that Karen's death was caused by a toxic level of Elavil, as potentiated[6] by the presence of Soma, Demerol, and Darvon. The toxicologist further testified that, when taken in combination, these four drugs can produce or increase the chances for heart-related complications like arrhythmia, tachycardia, bradycardia, and palpitations.

### III. EMTALA

EMTALA was enacted by Congress to address a growing concern that hospitals were either "dumping" patients who could not pay or transferring them to another hospital before their emergency conditions were

---

4. Karen told Dr. Watson that she was afraid workers' compensation insurance would not pay for her hospital stay.

5. The prescription drugs in Karen's bloodstream included Soma, Demerol, Darvon, and Elavil. Karen had been taking pain killers since her shoulder injury, and Leslie had become con-

cerned that Karen might be addicted to them. Mesquite Medical Center had refused to prescribe further addictive medications for Karen.

6. "Potentiated" means that the risk of a life-threatening or fatal event, such an as abnormal rhythm of the heart, is greatly increased.

stabilized. *See Miller v. Medical Ctr.*, 22 F.3d 626, 628 (5th Cir.1994); *Casey v. Amarillo Hosp. Dist.*, 947 S.W.2d 301, 304 (Tex. App.—Amarillo 1997, writ denied). To come within EMTALA's protections, however, a plaintiff need not allege that she was indigent or uninsured, or that her economic status, race, ethnicity, or any other reason motivated the hospital to treat her differently from other patients. *See C.M. v. Tomball Reg'l Hosp.*, 961 S.W.2d 236, 241 n. 5 (Tex.App.—Houston [1st Dist.] 1997, no writ); *see also Casey*, 947 S.W.2d at 304.

EMTALA was not intended to duplicate or preempt state law protections that already existed, but was intended to create a new cause of action not available under state law for "failure to treat." *Casey*, 947 S.W.2d at 304 (citing *Summers v. Baptist Med. Ctr.*, 91 F.3d 1132, 1137 (8th Cir.1996)). An EMTALA violation is vastly different from medical negligence because the duty it created is limited in a very critical sense: "EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for mis-diagnosis or medical negligence." *Watts v. Hermann Hosp.*, 962 S.W.2d 102, 104 (Tex.App.—Houston [1st Dist.] 1997, no writ) (quoting *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir.1994)); *Casey*, 947 S.W.2d at 304.

EMTALA places two requirements on hospitals:

- the hospital must provide for an appropriate medical screening examination to determine whether an emergency medical condition exists; and
- if the hospital determines that an emergency medical condition exists, the hospital must either stabilize the medical condition or transfer the individual to another facility.

*See* 42 U.S.C.A. § 1395dd(a), (b). Failure to meet either of these requirements gives rise to a cause of action under EMTALA, *see Casey*, 947 S.W.2d at 304, but only the second "failure to stabilize" requirement is before us.

■ EMTALA defines an emergency medical condition as a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain), such that the absence of immediate medical attention could reasonably be expected to result in (1) placing the health of the individual in serious jeopardy, (2) serious impairment to bodily functions, or (3) serious dysfunction of any bodily organ or part. *See* 42 U.S.C.A. § 1395dd(e)(1). However, an emergency medical condition exists only if a patient is in "imminent" danger of death or a worsening condition that could be life threatening. *See Watts*, 962 S.W.2d at 104.

■ Moreover, the mere fact that an emergency medical condition existed will not establish a failure to stabilize claim. To prevail, the claimant must show that the hospital "determined," through the actual knowledge of the doctors on duty, that an emergency medical condition existed. *See Casey*, 947 S.W.2d at 304–05. Because EMTALA is not a medical malpractice statute, the hospital's actions are to be viewed in terms of the actual diagnosis, not in terms of what the diagnosis should have been. *See id.* at 304; *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir.1996). In addition, a showing of the hospital's suspicions regarding an emergency medical condition does not rise to the level of actual knowledge. *See Casey*, 947 S.W.2d at 307.

### IV. HOSPITAL'S DETERMINATION REGARDING EMERGENCY MEDICAL CONDITION

In this case, the jury found:

- At the time of her discharge from the hospital on October 12, 1992, Karen had an emergency medical condition.
- At the time Karen was discharged on October 12, the Hospital had not determined that Karen had an emergency medical condition.
- At the time of Karen's discharge on October 12, the Hospital had not failed to provide further medical treatment necessary to stabilize Karen's emergency medical condition.

In their first point, appellants challenge the legal sufficiency of the evidence to support the jury's finding that the Hospital had not determined Karen had an emergency

medical condition, and they assert that the trial court erred by failing to disregard it. In point two, appellants contend that the trial court erred by denying their motion for new trial because the evidence is factually insufficient to support the jury's answer.

If an appellant attacks the legal sufficiency of an adverse answer to a finding on which he had the burden of proof, the Texas Supreme Court has stated that the appellant must, as a matter of law, overcome two hurdles. *See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the fact finder's answer, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *See id.; Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

▆ If an appellant challenges the factual sufficiency of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *See Ames v. Ames,* 776 S.W.2d 154, 158–59 (Tex.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). So considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *See Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

▆ The record contains legally and factually sufficient evidence to support the jury's finding. Although Karen's vital signs were somewhat abnormal, they were inconsistent with a patient who is medically unstable. Test results indicated Karen had a very low hemoglobin level and chronic anemia, but that she had no signs or symptoms of an acute bleeding condition. Even appellants' expert testified that Karen's anemia was chronic and that she did not appear to have exhibited any acute symptoms.

▆ Also, while Dr. Plantz believed death was a risk if Karen delayed additional treatment, he did not think death was certain to occur. Dr. Plantz considered Karen to be medically stable throughout her stay in the emergency room, and Dr. Keller agreed that Karen's anemia was not an emergency medical condition. Both doctors believed Karen could wait until the next morning for further medical treatment. Moreover, while Leslie testified that an emergency room *nurse* told Karen it was a miracle she was alive, there is no evidence that any of the Hospital's *doctors* held that opinion. A hospital's knowledge of an emergency medical condition is imputed through its doctors on duty, not its nursing staff. *See Casey,* 947 S.W.2d at 304–05.

The jury could have reasonably concluded from this evidence that Drs. Plantz and Keller did not believe Karen had an emergency medical condition, and therefore that the Hospital had made no such determination. Whether Drs. Plantz and Keller should have known Karen had an emergency medical condition is not at issue, but only whether the doctors actually made this determination. *See Vickers,* 78 F.3d at 145.

We hold that the trial court did not err by failing to disregard the jury's finding to Jury Question 2 and by denying appellants' motion for new trial. We overrule points one and two. In light of our holdings with regard to these points, we need not consider points three and four, in which appellants challenge the legal and factual sufficiency of the evidence to support the jury's finding that the Hospital did not fail to provide the additional medical treatment necessary to stabilize Karen's emergency medical condition. EMTALA does not require further treatment unless a hospital first determines that an emergency medical condition exists. *See* 42 U.S.C.A. § 1395dd(b).

## V. EXCLUDED EVIDENCE

▆ In August 1996, the U.S. Department of Health and Human Services (DHHS) notified the Hospital of DHHS's determination—based on an investigation of Karen's visit to the emergency room—that the Hospital had violated EMTALA's duty-to-stabilize

provision. Appellants sought to admit DHHS's findings into evidence, but the Hospital objected and the trial court excluded the report. In their fifth point, appellants complain that the trial court abused its discretion by excluding DHHS's report.

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *See Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex.1997); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *See Downer*, 701 S.W.2d at 241–42.

Appellants contend the report was admissible under the public records and reports exception to the hearsay rule. *See* TEX.R. EVID. 803(8). But public records and reports are not admissible under rule 803(8) if the source of information or other circumstances indicate a lack of trustworthiness. *Id.* At trial, the Hospital objected that the report was unreliable because the DHHS investigator was not a physician and therefore was not qualified to make a medical finding about whether the Hospital had determined that Karen had an emergency medical condition.

Neither the DHHS investigator nor the administrator who made the initial conclusions about EMTALA violations were physicians. Under EMTALA, a hospital's determination of whether a patient has an emergency medical condition must be made by a physician. *See Casey*, 947 S.W.2d at 304–05. Thus, in this civil suit based on alleged EMTALA violations, the trial court could reasonably have refused to admit as unreliable DHHS's findings, because they were not made by a physician.[7] Because the trial court did not abuse its discretion by excluding DHHS's investigative report, we overrule point five.

## VI. CONCLUSION

Having disposed of all of appellants' points, we affirm the trial court's judgment.

---

7. We express no opinion about whether DHHS's findings would be admissible in an administrative appeal arising from alleged EMTALA violations. Appellants' reliance on *Sensitive Care, Inc. v. Texas Dep't of Human Servs.*, 926 S.W.2d 823 (Tex.App.—Austin 1996, no writ) is misplaced. That case involved an administrative appeal, and the trial court held that the administrative inspection report at issue was reliable. *See id.* at 824, 826.