UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SYDNEY S. PETTYJOHN, individually
and as personal representative of the
estate of Steven Kemp Pettyjohn,
deceased; WALKER PETTYJOHN, III,
                    *Plaintiffs-Appellants,*

            v.

MISSION-ST. JOSEPH'S HEALTH
SYSTEM, INCORPORATED; SAINT
JOSEPH'S HOSPITAL,
                    *Defendants-Appellees.*

No. 01-1140

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Max O. Cogburn, Magistrate Judge.
(CA-99-171-1-C)

Argued: September 27, 2001

Decided: October 30, 2001

Before WILKINS and WILLIAMS, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Bryant Libby Welch, BRYANT L. WELCH, J.D., PH.D.
& ASSOCIATES, Potomac, Maryland, for Appellants. James Walker

Williams, ROBERTS & STEVENS, P.A., Asheville, North Carolina, for Appellees. **ON BRIEF:** Sarah O. Rollman, BRYANT L. WELCH, J.D., PH.D. & ASSOCIATES, Potomac, Maryland, for Appellants. Gary T. Bruce, ROBERTS & STEVENS, P.A., Asheville, North Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Sydney and Walker Pettyjohn (the Pettyjohns) brought the present civil action in the United States District Court for the Western District of North Carolina against St. Joseph's Hospital, Inc. (the Hospital) and Mission-St. Joseph's Health System, Inc. (collectively the Defendants), following the suicide-death of their son Steven Pettyjohn (Steven).[1] The Pettyjohns allege that Steven's suicide-death resulted from the Hospital's failure to stabilize his bipolar disorder prior to releasing him from its emergency room, in violation of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd.

Sydney Pettyjohn, Steven's mother, filed the action in her individual capacity and in her capacity as the personal representative of Steven's estate, while Walker Pettyjohn filed the action only in his individual capacity. All parties consented to the action being handled by a United States Magistrate Judge. *See* 28 U.S.C. § 636(c). Following discovery, the magistrate judge granted summary judgment in favor of the Defendants with respect to the Pettyjohns' claims. The Pettyjohns noted a timely appeal. We affirm.

---

[1] The Pettyjohns allege in their complaint that Mission-St. Joseph's Health System, Inc. is the successor corporation to the Hospital.

## I

At 8:15 p.m., on Saturday, August 23, 1997, Steven, age twenty-five, presented himself to the Hospital's emergency room in Asheville, North Carolina, complaining of feelings of isolation and depression.[2] Steven had normal vital signs and was under no physical distress.

Following an examination by a triage nurse, Steven was promptly examined by emergency room physician Rita Ann Wilson Ogron, M.D. (Dr. Ogron), who is board certified in emergency medicine. Dr. Ogron determined that Steven was physically stable from an emergency medicine standpoint; but she ordered the psychiatric social worker on call to conduct a comprehensive psychiatric profile of Steven. Carol Counts-Kuzma (Dr. Counts), who holds a Ph.D. in clinical psychology, was the psychiatric social worker on call.

Shortly before Dr. Counts began evaluating Steven, Dr. Counts telephoned Sydney Pettyjohn at her home in Chatham, Virginia in order to obtain Steven's medical history. During that telephone conversation, Sydney Pettyjohn told Dr. Counts that, three months earlier, her son had stopped taking the lithium prescribed to control his bipolar disorder, and that he was experiencing the same symptoms she had seen prior to his past hospitalizations, including suicidal ideation. She also informed Dr. Counts that Steven had no public or private medical insurance.

Based upon her observations/evaluation of Steven, Dr. Counts recorded that Steven was depressed and anxious, and had tangential thought form, flight of ideas, ideas of reference, paranoid trends, and guilt. Nevertheless, Dr. Counts also described Steven as well groomed, cooperative, having fair judgment, fair insight, and having a normally functioning memory.

---

[2]Steven regularly received mental health counseling at Blue Ridge Center in Asheville and had an appointment with a psychiatrist at Blue Ridge Center on Thursday, August 28, 1997. Steven had a college degree and was employed by a professional cleaning service at the time he presented to the Hospital's emergency room.

Following her comprehensive evaluation of Steven, Dr. Counts diagnosed him with bipolar disorder, mixed state, but concluded that his condition was nonetheless stable and that he did not meet involuntary commitment criteria.[3] According to Dr. Counts, Steven informed her that he still had lithium available at home, thus he did not need another prescription.

Despite Dr. Counts' conclusion that Steven's condition was stable, she offered him admission to the hospital as a comfort measure, but he declined. Following consultation about Steven's case between Drs. Counts and Ogron, Dr. Ogron also concluded that Steven was not suicidal, his condition was stable, and he did not meet involuntary commitment criteria. Accordingly, Steven was discharged with instructions to resume taking his lithium and to report to Blue Ridge Center on Monday, August 25, 1997.[4] Steven was also informed that he could return to the Hospital's emergency room at anytime.

Notably, prior to Steven's full discharge from the Hospital's emergency room, Dr. Counts assisted him in telephoning his mother in order to update her concerning his condition and treatment plan. After Steven had finished talking with his mother, Dr. Counts herself again spoke with Sydney Pettyjohn to learn whether she was comfortable with Steven's proposed discharge and treatment plan. Following this telephone conversation, Dr. Counts recorded in Steven's medical record that Sydney Pettyjohn was "in agreement" with Steven's proposed discharge and treatment plan. (J.A. 218).

Steven left the Hospital's emergency room at approximately 11:45 p.m. the same evening that he had arrived. Tragically, Steven committed suicide approximately six days later. The record does not disclose whether he received counseling/treatment at Blue Ridge Center between the time of his discharge from the Hospital's emergency room and his death.

---

[3]According to Dr. Counts, involuntary commitment criteria "involve[s] being a danger to yourself or to someone else." (J.A. 104).

[4]At some point prior to Steven's discharge, Dr. Ogron also learned that he had no public or private health insurance.

## II

In order to survive the Defendants' motion for summary judgment, the Pettyjohns have the burden of proffering sufficient evidence from which a reasonable jury could find, by a preponderance of the evidence, that: (1) Steven had an "emergency medical condition" within the meaning of EMTALA[5] when he presented to the Hospital; (2) the Hospital actually knew of that condition; and (3) Steven was not stabilized prior to discharge. 42 U.S.C. § 1395dd(b); *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 883 (4th Cir. 1992).

With respect to each of these elements, the Pettyjohns rely almost exclusively upon the deposition testimony of their expert witness, psychiatrist Pleas Rogers Geyer, M.D. (Dr. Geyer), who reviewed the medical records of Steven's August 23, 1997 visit to the Hospital's emergency room prior to giving his deposition testimony in this case. With respect to the first of the above listed elements, Dr. Geyer testified that in his expert medical opinion Steven had an emergency medical condition within the meaning of EMTALA when he presented to the Hospital's emergency room. The magistrate judge assumed *arguendo* that such testimony was sufficient to meet the first element.

With respect to the second element—whether the Hospital actually knew of that condition—Dr. Geyer, at most, opined that, based upon all of the information that Drs. Ogron and Counts recorded in Steven's medical record during his visit to the Hospital's emergency room, Drs. Ogron and Counts should have known that Steven had an emergency medical condition within the meaning of EMTALA. The magistrate judge concluded that such expert opinion evidence was

---

[5]Of relevance in the present appeal, EMTALA defines "an emergency medical condition" as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . .

42 U.S.C. § 1395dd(e)(1)(A).

insufficient to meet the Pettyjohns' burden of proving actual knowledge on the part of the Hospital of the severity of Steven's condition. In this regard, the magistrate judge emphasized that "the medical record is clear that [the Defendants] not only identified the disease from which [Steven] was suffering, but also the severity of the symptoms, and determined that he was stable." (J.A. 415). Thus, the magistrate judge reasoned, "[t]he [H]ospital's perception of the severity of the diagnosis cannot be separated from the diagnosis itself." *Id.* The magistrate judge finally concluded that, at most, Dr. Geyer's testimony supports medical malpractice claims, which the law clearly states are beyond the scope of EMTALA. *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 143 (4th Cir. 1996) (EMTALA "does not provide a cause of action for routine charges of misdiagnosis or malpractice.").

We agree with the magistrate judge that Dr. Geyer's deposition testimony is insufficient for a reasonable jury to find that Drs. Ogron and/or Counts actually knew that Steven had an emergency medical condition within the meaning of EMTALA. At most, Dr. Geyer's testimony supports possible medical malpractice claims, which claims plainly fall outside the scope of EMTALA. *Vickers*, 78 F.3d at 143 (EMTALA "does not provide a cause of action for routine charges of misdiagnosis or malpractice."); *Baber*, 977 F.2d at 880 ("Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery."). We also note the absence in the record of any evidence suggesting that the Hospital has ever treated another patient with symptoms the same as or similar to Steven more aggressively than it treated Steven. The absence is significant to our analysis given that "disparate treatment of individuals perceived to have the same condition is the cornerstone of an EMTALA claim . . . ." *Vickers*, 78 F.3d at 144. In short, we agree with the magistrate judge that the Pettyjohns did not carry their evidentiary burden with respect to the actual knowledge element of an EMTALA failure to stabilize claim. Accordingly, we affirm the grant of summary judgment in favor of the Defendants on this basis.

*AFFIRMED*