**John H. WATTS and Deborah Watts, Appellants,**

**v.**

**HERMANN HOSPITAL, Appellee.**

**No. 01–97–00306–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 20, 1997.

---

## OPINION

NUCHIA, Justice.

John and Deborah Watts sued Hermann Hospital for a violation of the Federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (1994). The trial court granted Hermann Hospital's motion for summary judgment and rendered a takenothing judgment. We affirm.

## BACKGROUND

John Watts (Watts) lost his leg as a result of a motorcycle accident on April 2, 1993. At the time of the accident, he was rushed to Hermann Hospital, where doctors had to amputate the damaged leg above the knee. On April 13, 1993, Watts was discharged from Hermann Hospital, with instructions on how to care for his wound and his stump.

On May 5, 1993, around noon, Watts visited Dr. Nathan Coates, his treating orthopedic surgeon, at Dr. Coates's office. Dr. Coates determined that Watts's leg was becoming infected, and directed Watts to meet him over at Hermann Hospital at 3:00 p.m. when he was on duty. Dr. Coates readmitted Watts through the emergency room for treatment of the infection to his leg. Watts was treated at Hermann Hospital until June 9, 1993. On June 9, Dr. Coates had scheduled the revision of Watts's stump.[1] However, he apparently was overruled by another doctor, who said the stump revision was not necessary, and that Watts should be discharged.

On June 9, 1995, appellants filed this lawsuit alleging that Hermann Hospital failed to stabilize Watts's "emergency condition" before discharging him on June 9, 1993. Watts did not receive the stump revision that he claims was the root of his emergency condition until some three years after discharge, in September of 1996.

Hermann Hospital filed its motion for summary judgment against appellants' claims on the grounds that: (1) Watts was not in an emergency or unstable condition upon dis-

Christopher D. Wilsher, Bruce Feichtinger, Houston, for Appellants.

Carlos Soltero, Houston, for Appellee.

Before NUCHIA, MIRABAL and O'CONNOR, JJ.

---

1. The "stump" is the extremity of a limb after amputation. STEDMAN'S MEDICAL DICTIONARY 1491 (Williams & Wilkins 25th ed.1990). Although revision surgery is not defined by numerous medical dictionaries, from the context of several depositions, it appears that a revision surgery is the cutting back of tissue, apparently to fit the stump with a prosthetic.

charge; (2) there was no causal connection between Hermann Hospital's actions and the alleged injury; (3) Hermann Hospital cannot practice medicine; and (4) there was no criticism by Watts of Hermann Hospital's agents, or employees, or the surgery performed by Dr. Nathan Coates.

## DISCUSSION

### A. Point of Error II

In their second point of error, appellants contend that the trial court erred in granting Hermann Hospital's motion for summary judgment.

### 1. Standard of Review

In reviewing the granting of a motion for summary judgment, this Court will consider as true all the evidence that favors the non-movant. *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986); *Goldberg v. United States Shoe Corp.,* 775 S.W.2d 751, 752 (Tex.App.—Houston [1st Dist.] 1989, writ denied). We will indulge every reasonable inference in favor of the nonmovant, and we will resolve all reasonable doubts in his favor. *Continental Casing Corp. v. Samedan Oil Corp.,* 751 S.W.2d 499, 501 (Tex.1988); *Goldberg,* 775 S.W.2d at 752. If we determine that summary judgment was improperly granted, we will reverse the judgment and remand the cause for a trial on the merits. *Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988); *Anderson v. Varco Int'l, Inc.,* 905 S.W.2d 26, 28 (Tex.App.—Houston [1st Dist.] 1995, writ denied).

Summary judgment is proper for a defendant if the defendant conclusively establishes all elements of his affirmative defense as a matter of law. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex. 1979); *Anderson,* 905 S.W.2d at 28. The movant must show there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *MMP, Ltd.,* 710 S.W.2d at 60; *Anderson,* 905 S.W.2d at 28. In a summary judgment proceeding, the burden of proof is on the movant, and all doubts about the existence of a genuine issue of fact are resolved against the movant. *Roskey v. Texas Health Facilities Comm'n,* 639 S.W.2d 302, 303 (Tex.1982); *Anderson,* 905 S.W.2d at 28.

### 2. Emergency medical condition under EMTALA

■ The EMTALA was enacted by Congress to address a growing concern that hospitals were either "dumping" patients who could not pay, or transferring patients to another hospital, before their emergency conditions were stabilized. *Miller v. Medical Ctr.,* 22 F.3d 626, 628 (5th Cir.1994); *Casey v. Amarillo Hosp. Dist.,* 947 S.W.2d 301, 304 (Tex.App.—Amarillo 1997, n.w.h.). The duty created by EMTALA is a "limited" one in a very critical sense: "EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." *Vickers v. Nash Gen. Hosp., Inc.,* 78 F.3d 139, 142 (4th Cir.1996).

■ There are two requirements placed upon hospitals by the EMTALA. First, "the Hospital must provide for an appropriate medical screening examination ... to determine whether or not an emergency medical condition exists." 42 U.S.C. § 1395dd(a); *C.M. v. Tomball Reg'l Hosp.,* 961 S.W.2d 236, 240 (Tex.App.—Houston [1st Dist.] 1997, no writ). Second, if the hospital determines that an emergency medical condition exists, the hospital must either stabilize the medical condition, or transfer the individual to another medical facility. 42 U.S.C. § 1395dd(b); *C.M,* at 241. EMTALA defines an emergency medical condition as a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or the child) in serious jeopardy, (ii) serious impairment of bodily functions, or (iii) serious dysfunction of any bodily organ or part. 42 U.S.C. § 1395dd(e)(1). An emergency medical condition exists only if a patient is in "imminent" danger of death or a worsening condition which could be life-threatening. *Delaney v. Cade,* 986 F.2d 387, 392 (10th Cir.1993); *Tolton v. American*

*Biodyne, Inc.,* 854 F.Supp. 505, 511 (N.D.Ohio 1993), *aff'd,* 48 F.3d 937 (6th Cir. 1995). Generally, no claim is available where there is not a marked worsening by the next day. *See Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 271 (6th Cir.1990).

Hermann Hospital's first ground in its motion for summary judgment was that Watts did not have an emergency medical condition, or even if Watts did have an emergency medical condition upon his readmittance on May 5, 1993, he was stabilized by his later discharge on June 9, 1993. In support of its motion for summary judgment, Hermann Hospital proffered Watts's discharge summary, as well as the affidavit of Dr. Urquhart.

### a. Hermann Hospital's summary judgment evidence

■ At oral argument before this Court, appellants' counsel attacked the discharge summary as not being properly authenticated, and thus, incompetent summary judgment evidence. There is no indication in the record before us that appellants made this objection to the trial court. The discharge summary was authenticated by an affidavit. "Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend." TEX.R. CIV. P. 166a(f); *Jones v. Jones,* 888 S.W.2d 849, 852 (Tex.App.—Houston [1st Dist.] 1994, no writ); *Einhorn v. LaChance,* 823 S.W.2d 405, 410 (Tex.App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). Without a proper objection, defects in the authentication of attachments in support of a motion for summary judgment or response are waived. *Marchal v. Webb,* 859 S.W.2d 408, 417 n. 6 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Appellants' failure to object in the trial court waived this defect in form of the discharge summary.

Appellants also attacked Dr. Urquhart's affidavit as not having the medical records he purports to rely upon attached as exhibits, and for not affirmatively stating that the affidavit is true and correct. Although they raised these objections in their response to Hermann Hospital's motion for summary judgment, they did not obtain a written ruling on them from the trial judge. Appellants have waived these objections if they relate to form, and not substance. *Marshall v. Sackett,* 907 S.W.2d 925, 937 n. 6 (Tex.App.—Houston [1st Dist.] 1995, no writ); *Roberts v. Friendswood Dev. Co.,* 886 S.W.2d 363, 365 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

■ In this regard, appellants argue *Ceballos v. El Paso Health Care Sys.,* 881 S.W.2d 439, 444–45 (Tex.App.—El Paso 1994, writ denied), renders the failure to attach the medical records a substantive defect. In *Ceballos,* the court stated that:

> The failure to attach to, *or serve with,* Dr. Drumlovsky's and Nurse Williams' affidavits sworn or certified copies of the medical chart or other record referred to therein is not simply a defect in the form of his affidavit, but rather is a defect in the substance thereof. This is true because there is no way to tell from these affidavits on what specific medical chart they are basing their respective opinions.

*Id.,* at 445 (emphasis added).

In this case, the medical records were not attached to the affidavit; however, the discharge summary was attached as an exhibit to the motion for summary judgment, and served with Dr. Urquhart's affidavit. Although Dr. Urquhart's affidavit does not state exactly which medical records he relied on, a reading of the discharge summary demonstrates that the relevant portion of Dr. Urquhart's affidavit relating to Watts's readmittance at Hermann Hospital on May 5, 1993 through his discharge on June 9, 1993, was based upon it. Dr. Urquhart's affidavit follows and paraphrases all of the events found in the discharge summary, in exactly the same order. Therefore, *Ceballos* is distinguishable, because there is a way to tell what medical records Dr. Urquhart was basing his opinion on. *See Ceballos,* 881 S.W.2d at 445.

■ Appellants' complaint that Dr. Urquhart did not affirmatively state that his affidavit was true and correct, and that the

affidavit is not based upon personal knowledge, is a form defect that was waived. *See Grand Prairie Indep. Sch. Dist. v. Vaughn,* 792 S.W.2d 944, 945 (Tex.1990) (holding failure to object to personal knowledge is form defect); *Rizkallah v. Conner,* 952 S.W.2d 580, 585, 585 n. 4, 589 (Tex.App.—Houston [1st Dist.] 1997, no pet.) .

■ We next determine whether Hermann Hospital's evidence disproved that Watts was in an unstablized "emergency medical condition" as a matter of law. The discharge summary, which was signed by Watts's own physician, Dr. Coates, readily dispels appellants' contention that Watts was in an unstablized "emergency medical condition" upon discharge:

On 05/06/93, [Watts] underwent an irrigation and debridement of the left AKA, was jet lavaged under a general anesthesia. Cultures were taken and sent, and the patient was sent to the floor after the procedure *in good condition.*

On 05/07, he began whirlpool two daily and was maintained on his IV antibiotic regimen. His pain was well controlled with the PCA pump. [ ... ] The pain service was consulted regarding the patient's pain management and they continued to follow during the rest of his course. Physical therapy was consulted for this.

In addition to the pain service, psychiatry was consulted as well as the patient complained of inadequate pain management as well as difficulty sleeping at night. They added a small amount of diazepam to his regimen as well as some Mellarill.

There was some question during this course of osteomyelitis in this individual, and he underwent bone scan which demonstrated a soft tissue and bone involvement up to the left hip. On gallium scan, there was found to be no evidence of osteomyelitis or bony involvement. Orthopedics had been following the patient with the trauma service, and they were unable to offer any further help. *The patient's wound continued to close nicely and granulate. On 06/08 it was noted that the wound looked good, and there was an approximately 0.5 cm residual area of coverage that was granulating well. He was dis-*

*charged on 06/09 in good condition* with the following medications. . . .

FOLLOW–UP: Care was with Dr. Coates on 06/22/93 at 9:30, for prosthesis fitting with John Holmes. That phone number was given and with psychiatry as needed.

SPECIAL INSTRUCTIONS: Were [sic] in the use of crutches for ambulation. *Activity instructions included no driving or motorcycle riding for approximately two weeks or until cleared by a physician.*

(Emphasis added).

Dr. Urquhart's affidavit also demonstrates that Watts was in a stable nonemergency condition. This affidavit basically paraphrases the discharge summary. Dr. Urquhart stated that after receiving irrigation and debridement of the wound to treat the infection that had occurred, Watts began whirlpool therapy on May 7, 1993, which is more than a month before discharge. Dr. Urquhart then states that the wound continued to close nicely and on June 9, 1993 the patient was discharged in good condition, and that "[i]n all reasonable medical probability, John Watts was in a stable condition on June 9, 1993."

Hermann Hospital also provided the deposition testimony of one of Hermann Hospital's employees, Carlos Gonzalez, who testified that Watts was taken from the hospital to the social security administration so that he could apply for financial assistance on May 28, 1993, which was some 10 days prior to Watts's discharge on June 9, 1993. In order to leave, Mr Watts obtained a medical pass.

### b. Appellants' summary judgment evidence

Because Hermann Hospital's evidence is sufficient as a matter of law to disprove that Watts was in an unstablized "emergency medical condition," appellants were required to rebut this evidence and demonstrate a material issue of fact. Appellants attempt to establish a material issue of fact by presenting the affidavit of Dr. Steven Price, who conclusorily stated that the stump revision surgery "was essential to stabilize the emergency medical condition that had lead to his

admission to Hermann Hospital on May 5, 1993."

The Price affidavit is insufficient to meet appellants' burden for two reasons. First, federal courts, in interpreting EMTALA, have specifically held that the use of experts to perform this sort of hind-sight analysis is insufficient to impose liability under EMTA-LA. *Holcomb v. Humana Medical Corp.*, 831 F.Supp. 829, 835 (M.D.Ala.1993), *aff'd*, 30 F.3d 116 (11th Cir.1994); *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992). Second, the facts as alleged by Dr. Price, do not demonstrate an unstablized "emergency medical condition" at the time of discharge. "Stabilization" under EMTALA, means simply that the discharge itself will cause "no material deterioration of the condition before transfer." 42 U.S.C. § 1395dd(e)(3)(A). Under EMTALA, "transfer" is construed to include discharge of the patient. 42 U.S.C. § 1395dd(e)(4).

Dr. Price's affidavit and deposition concedes that Watts's condition had not materially deteriorated as of three years after discharge. In his affidavit, he explains his contact with Watts, which was not until several years after the discharge. Dr. Price maintains that Watts's stump was "irregular and raw," and that it showed "marked tenderness." Watts was apparently depressed, experienced pain, and had not been fitted with a prosthesis by the time of his meeting with Dr. Price. During the deposition of Dr. Price, he acknowledged that even some three years after discharge, Watts was stable and in a nonemergency condition, although he was still without the very surgery that Watts contends was the root of his emergency condition. Dr. Price also stated that "I cannot go ahead and make any statement that is absolutely definitive about clinical events that I did not personally witness roughly three years prior to my seeing this gentleman." The fact that Watts's condition was stable is further evidenced by the following exchange:

Q: Okay. If you had a patient that came to you that needed emergency surgery, would you send them over to the hospital immediately?

A: All right. I think there's an understanding of what emergency means. Okay. Mr. Watts needed to go ahead and have the revision as soon as possible. The fact that this had been going on for three years apparently is something that made a statement and also said that getting the right kind of procedure done in a controlled setting with the right surgeon as soon as possible was the important thing. *And whether that procedure was done the next day or in two weeks was not going to go ahead and be as critical as having those right circumstances*, the right set up, the right surgeon, the right everything.

(Emphasis added.) Dr. Price then concedes that the surgery was needed, but "was not necessarily the kind of thing that required going to an emergency room." Dr. Price finally concedes, "Okay. So it was a nonemergency situation when he came into my office."

The evidence presented to the trial court conclusively demonstrated that Watts was stable and not in an emergency condition upon discharge, or any point thereafter. These facts simply do not give rise to a cause of action under EMTALA. Assuming, *arguendo*, that Watts's infection was in fact an emergency condition upon admittance,[2] Hermann Hospital stabilized such after almost a month of treatment, until he was released in good condition. To the extent that appellants are contending that Watts's pain was the emergency medical condition, this condition was also stabilized upon discharge. Both the discharge summary, as well as appellants' own expert, indicate that his pain was being managed with pain killers. Dr. Price's statements that Watts was in pain some three years later is not relevant to Watts's condition upon discharge on June 9, 1993.

**2.** Arguably, Watts was not even in an emergency medical condition upon admittance. The summary judgment evidence demonstrates that Dr. Coates, upon examining Watts, did not "rush" him to the emergency room. Instead, he instructed Watts to meet him at the hospital several hours later when he went on duty. Absent Watts presenting himself to the hospital in an emergency medical condition, Hermann Hospital would have no duty to Watts under EMTALA.

Hermann Hospital's duty under EMTALA ended when it stabilized Watts's condition. *Green v. Touro Infirmary,* 992 F.2d 537, 539 (5th Cir.1993). EMTALA requires only that the hospital stabilize an individual's emergency condition; it does not require a hospital to cure that condition. *Id.; Brooker v. Desert Hosp. Corp.,* 947 F.2d 412, 415 (9th Cir.1991). We overrule appellants' second point of error.

### B. Point of Error I

In their first point of error, appellants contend that the trial court erred in not considering their objections and response to Hermann Hospital's Motion for Summary Judgment.

Both parties at oral argument agreed that the trial court had considered appellants' objections and response filed, and appellants abandoned this point of error. Accordingly, we overrule appellants' first point of error.

We affirm the judgment of the trial court.