Opinion issued March 8, 2012



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-01030-CV

———————————

Petro-Hunt, L.L.C., Appellant

V.

Wapiti
Energy, L.L.C.,
Appellee



 



 

On Appeal from the 151st District Court

Harris County, Texas



Trial Court Case No. 2005-65635

 



 

MEMORANDUM OPINION

Appellant, Petro-Hunt, L.L.C, appeals
the trial court’s grant of summary judgment on liability and rendition of
judgment on damages and attorneys’ fees for the breach of contract claim
asserted by appellee, Wapiti Energy, L.L.C. 
In five issues, Petro-Hunt argues (1) the trial court erred in granting
summary judgment because Wapiti failed to conclusively establish each element
of its breach of contract claim; (2) the trial court erred by determining that
Wapiti was not judicially estopped from asserting the production imbalance in
dispute was known; (3) the evidence establishes that Wapiti never suffered any
harm as a result of Petro-Hunt’s breach; (4) the trial court improperly
calculated damages by valuing the entire imbalance as of the gas value on a single
day; and (5) the trial court abused its discretion in awarding attorneys’ fees.

We affirm.

                                                                                                       
Background

The Conroe Field Unit is a pooled collection of oil and
gas interests in an area known as the Conroe Field.  The Conroe Field Unit was created in 1977 and
is operated by ExxonMobil.  Part of
ExxonMobil’s responsibility as operator of the Conroe Field Unit was to
allocate to the interest owners their proportionate share of the production for
the unit.  The interest owners would then
be paid for their reported share of production. 


For various reasons, ExxonMobil would subsequently make
adjustments to the production amounts. 
ExxonMobil would report these adjustments, known as production
imbalances.  If an interest had been
“overproduced,” this overproduction created a liability on the interest.  If an interest had been “underproduced,”
this underproduction would create a benefit for the interest.  Either way, a production imbalance affects
the value of an interest.

Petro-Hunt owned some interests in the Conroe Field
Unit.  In 2001, Petro-Hunt entered into
an agreement to sell its interest to Wapiti. 
This agreement was entitled the Purchase and Sale Agreement.  The Purchase and Sale Agreement was made
effective June 1, 2001 with closing set to occur July 20, 2001 at 10:00
a.m.  In the agreement, Petro-Hunt
represented and warranted that, to the best of its knowledge and information,
“there are no oil and gas production . . .
imbalances of which [Petro-Hunt] has notice relating to” the interests being
sold.  The parties agreed that “[a]ll representations and warranties set forth in this Agreement . . . shall survive for a period of
twelve (12) months following Closing.”

The agreement recognized that not all matters would be
finalized as of the date of closing. 
Accordingly, it provided:

As soon as practicable after Closing, but in no event
later than sixty (60) days after Closing, Seller shall prepare and deliver to
Buyer . . . a statement (“Final Settlement Statement”) setting forth
each adjustment or payment that was not finally determined as of Closing and
showing the calculation of such adjustment and the aggregate amount
thereof. . . .  The
Parties undertake to agree with respect to the amounts of any post-closing
adjustments no later than ninety (90) days after Closing.  The date upon which such agreement is reached
or upon which the aggregate amount of the adjustments is finally established
shall be called the “Final Settlement Date”. 
The Party owing the agreed net amount under the adjusted Final Settlement
Statement shall deliver the requisite amount via wire transfer to the other
Party within five (5) business days of the Final Settlement Date.

It also provided that, after closing, the parties
“shall  execute, acknowledge and deliver
or cause to be executed, acknowledged and delivered such instruments and take
such other action as may be necessary or advisable to carry out their
obligations under this Agreement and under any Exhibit, document, certificate
or other instrument delivered pursuant hereto.”

Some time after closing,
Petro-Hunt became aware that its representation and warranty that there were no
production imbalances in the relevant interests was not true.  It acknowledged this in its Final Settlement
Statement, delivered to Wapiti on October 17, 2001.  Specifically, Petro-Hunt represented:

The above settlement amount does not include any amounts
for gas imbalances, which were not known by Petro-Hunt LLC to exist at the time
the Purchase and Sale Agreement was signed or when the Sale from [Petro-Hunt]
to Wapiti was closed.  As of this time,
the quantities of the gas imbalances are not known nor is
the method of pricing the imbalances agreed upon by Petro-Hunt LLC and Wapiti
Energy LLC.  Settlement for the gas
imbalances will be made as soon as the amounts are known and mechanics of
settlement can be agreed upon by the Parties.

Petro-Hunt sent to Wapiti the amount it had otherwise
determined was owed, and Wapiti accepted this payment.

On March 12, 2002, John Faulkinberry,
a vice president for Wapiti at the time, sent a letter on behalf of Wapiti to
Alan Bain, Vice President of Real Estate Development at Petro-Hunt.  The letter listed outstanding matters that
needed to be addressed to finish closing on the Purchase and Sale
Agreement.  Included in that list was the
production imbalance.  On December 2,
2003, Faulkinberry sent a letter to Bain asserting
that the information needed to determine the production imbalance had been
completed by ExxonMobil.  Faulkinberry asserted that, based on ExxonMobil’s numbers,
Petro-Hunt owed Wapiti $349,730.  In his
affidavit attached to Wapiti’s motion for summary judgment, Faulkinberry
asserted that Bain called him in January 2004 and told him “that Petro-Hunt
refused to pay Wapiti for the gas imbalance.”

Wapiti sued Petro-Hunt on October 14, 2005, for breach of
contract.  In 2007, Wapiti amended its
pleadings to add a fraud claim, though that claim was ultimately dropped on the
first day of trial.

In March 2007, Wapiti sought summary judgment on liability
only for its breach of contract claim. 
Wapiti attached to its motion for summary judgment, among other things,
the affidavit of Lori Sims Hanagriff, a contract
worker for ExxonMobil that worked on “over/short statements
reflecting producer imbalances” for the Conroe Field Unit.  These reports “showed both the current month
amount and the cumulative amount, in mmbtu [million
British thermal units], of over- or under-production of gas (also referred to
as a producer imbalance) for each Conroe Field Unit working interest owner or
owner group for each production month.”

Attached to Hanagriff’s
affidavit was a copy of the “Adjusted Over & Short
Report for the production months of July 2000 through February 2002.”  Portions of this report were sent by Faulkinberry to Bain along with the December 2, 2003
letter.  According to Hanagriff,
the attached report “shows ExxonMobil’s final calculation of the gas imbalances
attributable to each Conroe Field owner for each of the production months of
July 2000 through February 2002.”

The trial court ultimately granted Wapiti’s motion for
summary judgment on liability for the breach of contract claim.  A bench trial subsequently
commenced on March 23, 2010 for the remaining issues of damages and attorneys’
fees.  The trial court awarded Wapiti
$424,811.80 in actual damages and $318,113 in attorneys’ fees with an
additional $25,000 for a successful defense of an appeal, $10,000 for a
successful defense of a petition for review before the Texas Supreme Court, and
$15,000 for a successful defense of a full appeal before the Texas Supreme
Court.  The trial court also filed
findings of fact and conclusions of law for damages on the breach of contract
claim and for Petro-Hunt’s affirmative defenses.

                                     
Summary Judgment on Breach of Contract Liability

In its first issue, Petro-Hunt argues the trial court
erred in granting summary judgment because Wapiti failed to conclusively
establish each element of its breach of contract claim.  In its second issue, Petro-Hunt argues that
the trial court erred by determining that Wapiti was not judicially estopped
from asserting the gas imbalance was known.

A.            
Standard of Review

The summary-judgment movant must conclusively establish
its right to judgment as a matter of law.  See MMP,
Ltd. v. Jones, 710 S.W.2d 59, 60 (Tex. 1986).  Because summary
judgment is a question of law, we review a trial court’s summary judgment
decision de novo.  Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848
(Tex. 2009).

To prevail on a “traditional”
summary-judgment motion, asserted under Rule 166a(c), a movant must prove that
there is no genuine issue regarding any material fact and that it is entitled
to judgment as a matter of law.  See Tex. R. Civ. P.
166a(c); Little v. Tex. Dep’t of Criminal Justice, 148 S.W.3d
374, 381 (Tex. 2004).  A matter is conclusively
established if reasonable people could not differ as to the conclusion to be
drawn from the evidence.  See City of Keller v.
Wilson, 168 S.W.3d 802, 816 (Tex. 2005). 

When a party moves
for summary judgment on a claim for which it bears the
burden of proof, it must show that it is entitled to prevail on each
element of its cause of action.  See Parker v. Dodge, 98 S.W.3d 297, 299
(Tex. App.—Houston [1st Dist.] 2003, no pet.). 
The party meets this burden if it produces evidence that would be
sufficient to support an instructed verdict at trial.  Id.  

To determine if
there is a fact issue, we review the evidence in the light most favorable to
the nonmovant, crediting favorable evidence if
reasonable jurors could do so, and disregarding contrary evidence unless
reasonable jurors could not.  See Fielding, 289 S.W.3d
at 848 (citing City of
Keller, 168 S.W.3d at 827). 
We indulge every reasonable inference and resolve any doubts in the nonmovant’s favor.  Sw. Elec. Power Co. v. Grant,
73 S.W.3d 211, 215 (Tex. 2002).

B.            
Analysis

In part of its first issue, Petro-Hunt argues the trial court
could not have granted summary judgment because certain portions of Wapiti’s
summary judgment should have been excluded. 
Petro-Hunt raised hearsay and improper authentication objections to
certain exhibits.  It also raised an
objection to one affidavit because the affiant had not been previously
disclosed pursuant to rule 194 of the Texas Rules of Civil Procedure.  See
Tex. R. Civ. P. 194.2(e), 194.3.  

The trial court did not rule on any of these
objections.  Objections of hearsay are
objections to the form of evidence, which are waived without a ruling on the
objection.  See Wilson v. Gen. Motors Acceptance Corp., 897 S.W.2d 818, 821–22
(Tex. App.—Houston [1st Dist.] 1994, no writ) (holding hearsay in affidavit is
defect in form); Vice v. Kasprzak, 318 S.W.3d 1, 11 (Tex. App.—Houston [1st
Dist.] 2009, pet. denied) (holding defects to form of evidence are waived
without securing a ruling).  The same is
true for objections to improper authentication. 
See Watts v. Hermann Hosp., 962 S.W.2d 102, 105
(Tex. App.—Houston [1st. Dist.] 1997, no pet.) (holding
objection to authentication of records attached to motion for summary judgment
waived because not raised in trial court); Commint Technical Servs., Inc. v. Quickel, 314 S.W.3d 646, 651 (Tex. App.—Houston [14th
Dist.] 2010, no pet.) (holding absence of ruling on
objection to form challenging propriety of authentication forecloses consideration
on appeal); David v. David, No.
01-09-00787-CV, 2011 WL 1326222, at *3 (Tex. App.—Houston [1st Dist.] 2011, no
pet.) (mem. op.) (holding
defects in authentication are defects of form). 
Because Petro-Hunt did not obtain a ruling on these objections, they
cannot be considered on appeal.

At oral argument, Petro-Hunt argued that the trial court
implicitly ruled on their objections, relying on Frisch v. Westin Homes of Tex., Inc., No. 01-04-00152-CV, 2005 WL
729502 (Tex. App.—Houston [1st Dist.] March 31, 2005, no
pet.) 
(mem. op.).  In that case, this Court acknowledged a Fort
Worth Court of Appeals case that held that objections to form are preserved
when the objections are written and the record indicates in some way that the
trial court ruled on the objection either expressly or implicitly.  Id.
at *3 n.4 (citing Frazier v. Yu, 987
S.W.2d 607, 609–10 (Tex. App.—Fort Worth 1999, pet. denied)).  This Court also acknowledged, however, other
courts that have held “that the granting of a summary judgment motion does not
necessarily provide an implicit ruling that either sustains or overrules
objections to the summary judgment evidence.” Id. (citing Well Solutions,
Inc. v. Stafford, 32 S.W.3d 313, 317 (Tex. App.—San Antonio 2000, no pet.);
Dolcefino v. Randolph, 19 S.W.3d 906, 926 (Tex.
App.—Houston [14th Dist.] 2000, pet. denied)).

Petro-Hunt argues that we held in Frisch that an implicit overruling could exist.  We disagree. 
We held, “Even if a trial court’s summary judgment is adequate to infer
that it impliedly had sustained a movant’s specific objections to the
non-movant’s summary judgment evidence under Rule 33.1(a), here, [appellee]’s
global objection is too general to present an issue for review.”  Id. at *4.  In a
footnote, we added that an implied ruling on objections may exist under other
circumstances.  Id. at *4 n.5.  Nowhere in the opinion did we hold that
implied rulings on objections did exist.

Since then, however, this Court has resolved the issue we
left open in Frisch.  “[A] trial court’s ruling on an objection to
summary judgment evidence is not implicit in its ruling on the motion for
summary judgment.” Delfino v. Perry Homes, 223 S.W.3d 32, 35 (Tex. App.—Houston [1st Dist.]
2006, no pet.) (citing Well Solutions, 32 S.W.3d at 317). 
Accordingly, there is no implied ruling from the trial court.

For its objections about an affiant not being previously
disclosed, Petro-Hunt cites no authority for the rules concerning disclosing
witnesses, their application to summary judgment proceedings, how error is
shown, how harm is established, or how any of these rules apple to this case.  Petro-Hunt also does not show that it sought
a continuance based on the undisclosed witness.

Petro-Hunt has wholly failed to brief this argument on
either the law or the law’s relation to the facts of this case.  See
Tex. R. App. P. 38.1(i) (requiring brief to contain clear and concise argument
for contentions made “with appropriate citations to authorities and to the
record”).  Although appellate courts
generally construe the briefing rules liberally, points of error or issues
unsupported by the citation of authority present nothing for the court to
review.  Arias v. Brookstone, L.P., 265 S.W.3d
459, 470 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); Harris Cnty. Mun. Util. Dist. No. 48 v. Mitchell, 915
S.W.2d 859, 866 (Tex. App.—Houston [1st Dist.] 1995, writ denied).  Accordingly, we hold that Petro-Hunt waived
any error relating to any failure to timely disclose a witness.

Next we consider whether Wapiti met its summary judgment
burden.  In its motion for summary
judgment, Wapiti argued it could establish as a matter of law that Petro-Hunt
breached the Purchase and Sale Agreement. 
The elements for a breach of contract claim are: (1) the existence of a
valid contract; (2) performance or tendered performance by the plaintiff; (3)
breach of the contract by the defendant; and (4) damages sustained by the
plaintiff as a result of the breach. Wright v. Christian & Smith, 950 S.W.2d 411, 412 (Tex. App.—Houston
[1st Dist.] 1997, no writ).  A
party may obtain summary judgment on liability only and then try damages issues
on their merits.  Tex. R. Civ. P. 166a(a); McAllister v. Samuels, 857 S.W.2d 768,
774 (Tex. App.—Houston [14th Dist.] 1993, no writ).  Accordingly, we consider whether Wapiti
established as a matter of law Petro-Hunt’s liability for breach of contract.[1]

Both of the parties acknowledge that a valid contract
existed: the Purchase and Sale Agreement. 
Nor is there any dispute that Wapiti performed or tendered performance
under the contract.  The only element in
dispute, then, is whether Petro-Hunt breached the contract.

Petro-Hunt represented and warranted in the agreement
that, to the best of its knowledge, there were not any production imbalances
related to the interests being sold. 
There is no evidence in the record to suggest that the representation
and warranty was not true at the time. 
Regardless, that representation and warranty survived the closing date
of the agreement, and, on October 17, 2001, Petro-Hunt acknowledged that it had
become aware of a production imbalance. 
Petro-Hunt represented that payment would be made once the amounts were
known and the “mechanics of settlement can be agreed upon by the Parties.”  

The Purchase and Sale Agreement obligated Petro-Hunt to
“take such other action as may be necessary or advisable to carry out their
obligations under this Agreement and under any . . . document
. . . or other instrument delivered pursuant” to the agreement.  Furthermore, it was Petro-Hunt’s initial
obligation to prepare a statement “setting forth each adjustment or payment
that was not finally determined as of Closing and showing the calculation of
such adjustment and the aggregate amount thereof.”  While Petro-Hunt did deliver to Wapiti a
statement setting forth some of the adjustments and payments, it acknowledged
in that statement that the adjustments and payments were not complete due to
the outstanding issue of production imbalance. 
Accordingly, it had not fulfilled this obligation under the contract.

The evidence also shows that, at least as of October 2002,
ExxonMobil had issued its “final calculation of the gas imbalances attributable
to each Conroe Field owner for each of the production months of July 2000
through February 2002.”  In December
2003, Faulkinberry sent the relevant portions of this
report to Bain and asked Petro-Hunt to complete its obligations to pay the
imbalance.  In January, 2004, “Petro-Hunt
refused to pay Wapiti for the gas imbalance.” 
We hold that this evidence is sufficient to meet Wapiti’s burden of
showing that Petro-Hunt breached the Purchase Settlement Agreement.  

Petro-Hunt argued at trial and on appeal that the Purchase
and Sale Agreement required the agreement of the parties on the post-closing
amounts.  “Without such agreement, under
the terms of the [Purchase and Sale Agreement], the post-closing amounts were
not due.”  Petro-Hunt argued that no
agreement was possible because the amount of the imbalance, if any, was not
known.

Petro-Hunt acknowledges that ExxonMobil was the field
operator for the Conroe Field Unit at all times relevant to determining the
production imbalance.  It does not
dispute that ExxonMobil was the entity responsible for reporting the volume of
all productions imbalances for the Conroe Field Unit.  Hanagriff’s
affidavit established that ExxonMobil made its final calculation of the gas
imbalances at least as of October 2002. 
This is sufficient evidence to establish that the amount of the
production imbalance was known.

Petro-Hunt asserts there is an unresolved fact issue on
whether the production imbalance was known because Faulkinberry
testified in a deposition for another lawsuit that the ExxonMobil numbers were
wrong.  That lawsuit was brought by
Wapiti against Duke Energy Field Services, L.P. and Crosstex
Energy Service, L.P.  In his deposition, Faulkinberry discussed another interest in the Conroe Field
Unit that Wapiti had obtained from another entity, Ocean Energy.  That interest is separate from the interests
in dispute in this case.

In the deposition, Faulkinberry
discussed the report from ExxonMobil on the production imbalance for Ocean
Energy.  According to Faulkinberry,
the ExxonMobil report showed there was a production imbalance that required
Wapiti to pay Ocean Energy for the adjustment. 
Faulkinberry testified that he could not
“verify or understand or substantiate Exxon’s imbalance numbers.”  He also testified that he had employed
auditors to understand it, “and to this date we do not understand it.  To this date, they do not understand
it.”  Ultimately, Faulkinberry
asserted that he believed the production imbalance numbers were wrong.  Regardless, Wapiti accepted “to use the
imbalance number as shown in Exxon’s producer over/short statement” and paid
Ocean Energy for the production imbalance.

We first note that Petro-Hunt never established that the
production imbalance report discussed in Faulkinberry’s
prior deposition was the same production imbalance report relied on for this
case.  Even if we were to assume that the
two reports were the same, however, this is not sufficient evidence to create a
fact issue.  

As Faulkinberry explained in
that deposition, the Exxon report tied every entry to a company, each of which
were represented by specific numbers. 
“[I]f you knew within the Exxon system what number . . .
represented Ocean, then you could determine Ocean’s account number.”  Putting Faulkinberry’s
testimony in context, it is apparent that all of Faulkinberry’s
discussions of the Exxon report concerned the amounts reported for Ocean
Energy.  Faulkinberry
never testified that he examined the entire report and found it to be
wrong.  His only testimony was that he
found the numbers reported for Ocean Energy to be wrong.

When testimony “could give rise to any number of
inferences, none more probable than another,” then the evidence does not rise
to “more than a scintilla to withstand a no-evidence challenge.” Blount v. Bordens,
Inc., 910 S.W.2d 931, 933 (Tex. 1995).  When circumstances are consistent with either
of two facts and nothing shows that one is more probable than the other,
neither fact can be inferred.  Transp. Ins. Co. v. Faircloth,
898 S.W.2d 269, 278 (Tex. 1995).  

The summary judgment standard of review requires us to
assume that ExxonMobil’s data for Ocean Energy was wrong.  See Fielding, 289 S.W.3d at 848 (holding courts must view
evidence in light most favorable to nonmovant).  This does not, however, establish that the
data for Petro-Hunt was wrong.  There is
no more reason to believe that Petro-Hunt’s data was wrong than to believe that
Petro-Hunt’s data was right.  Because Faulkinberry’s deposition testimony does not make any
inference more probable than any other, it is not sufficient to create a fact
issue.  See Blount, 910 S.W.2d at 933.

We overrule Petro-Hunt’s first issue.

Petro-Hunt also argues that the same Faulkinberry
deposition testimony functions to judicially estop Wapiti from asserting that
the production imbalance numbers were known. 
To prevail on a claim of judicial estoppel, the party asserting it must
show: (1) a sworn, inconsistent statement be made in a prior judicial
proceeding; (2) the party making the statement gained some advantage by it; (3)
the statement was not  made inadvertently
or because of mistake, fraud, or duress; and (4) the statement was deliberate,
clear, and unequivocal.  Galley v. Apollo Associated Servs.,
Ltd., 177 S.W.3d 523, 528–29 (Tex. App.—Houston [1st Dist.] 2005, no
pet.).  We have already held that Faulkinberry’s deposition testimony from the earlier case does
not create a fact issue in this case. 
For the same reasons, it cannot constitute an “inconsistent
statement.”  Accordingly, judicial
estoppel does not apply.

We overrule Petro-Hunt’s second issue.

                                                 
Bench Trial on Breach of Contract Damages

In its third issue, Petro-Hunt argues the evidence
establishes that Wapiti never suffered any harm as a result of Petro-Hunt’s
breach.  In its fourth issue, Petro-Hunt
argues the trial court improperly calculated damages by valuing the entire
imbalance as of the gas value on a single day.

A.            
Standard of Review

In an appeal from a bench trial, findings of fact have the
same weight as a jury’s verdict on special issues.  Lee v. Lee, 981 S.W.2d 903, 905 (Tex. App.—Houston [1st Dist.]
1998, pet. denied).  We review the
legal and factual sufficiency of the evidence supporting a trial court’s
findings of fact by the same standards that we apply to reviewing the legal or
factual sufficiency of the evidence supporting jury findings.  Catalina v. Blasdel, 881 S.W.2d 295, 297
(Tex. 1994).  Thus, if the
complaining party challenges the legal sufficiency of the evidence underlying
an adverse finding on which the party did not have the burden of proof, then
the party must demonstrate on appeal that there is no evidence to support the
finding.  City of Pasadena v. Gennedy,
125 S.W.3d 687, 691 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).  In such a review, we consider all the
evidence in the light most favorable to the prevailing party, indulging every
reasonable inference in that party’s favor, and disregard all evidence and
inferences to the contrary.  Id. at 692.  We do not disregard contrary evidence if
there is no favorable evidence or if contrary evidence renders supporting
evidence incompetent or conclusively establishes the opposite.  City of
Keller, 168 S.W.3d at 810–11.  If more than a scintilla of evidence supports
the finding, the no-evidence challenge fails. 
Gennedy,
125 S.W.3d at 692.

In our review of factual sufficiency of the evidence, we
must consider and weigh all of the evidence. 
Pool v. Ford
Motor Co., 715 S.W.2d 629, 635 (Tex. 1986).  We will set aside a verdict only if the
evidence is so weak or if the finding is so against the great weight and
preponderance of the evidence that it is clearly wrong and unjust.  Id.  

B.            
Analysis

Petro-Hunt argues in its third issue that Wapiti never
suffered any harm as a result of the breach because it has completely mitigated
its damages and because the breach concerned a contingent liability that never
matured during Wapiti’s ownership of the interest.

The evidence shows that the interest that Petro-Hunt sold
was overproduced, creating a liability in the interest.  The evidence also shows that ExxonMobil sold
to Wapiti an interest that was underproduced.  After netting all of the production interests
it had acquired in the Conroe Field Unit, Wapiti was left with an
underproduction position.  Petro-Hunt
argues that this establishes that Wapiti has completely mitigated any damages
from its acquisition of Petro-Hunt’s interest.

Wapiti argues that this does not establish that it fully
mitigated its damages.  We agree.  The testimony at trial established that an
overproduction position creates a liability on the relevant interest, which
affects the value of the interest.  When
Petro-Hunt and Wapiti entered into an agreement for Wapiti to purchase
Petro-Hunt’s interests in the Conroe Field Unit, Petro-Hunt represented and
warranted that there were no production imbalances relating to the interests
being sold.  Petro-Hunt subsequently
learned that their interests were overproduced, and notified Wapiti,
acknowledging that adjustments would have to be made.  These adjustments ultimately relate to the
value of the interests that Petro-Hunt sold to Wapiti.  The parties agreed to a price based, in part,
on the representation that no production imbalances existed.  When the overproduction position was
discovered, both parties acknowledged that an adjustment would have to be made.

The amount that Wapiti paid for other interests in the
Conroe Field Unit would have no effect on the damage Wapiti suffered for
overpaying Petro-Hunt based on Petro-Hunt’s inaccurate representation and
warranty.  The amount that Wapiti
subsequently sold its interests to a third-party would have no effect on this
damage, either.

Petro-Hunt also argues that the breach concerned a
contingent liability that never matured during Wapiti’s ownership of the
interest.  Wapiti disputes Petro-Hunt’s
assertion that the liability is contingent. 
Assuming without deciding that the interest is contingent, however, this
argument is unavailing.  The Purchase and
Sale Agreement required Wapiti to assume “all obligations and liabilities
arising from or in connection with any . . .
imbalances attributable to substances produced from the Interests before or
after the Effective Time.”  By the
language of the contract, then, Wapiti accepted liability for any production
imbalances.  Petro-Hunt ultimately
acknowledged that an imbalance existed and that a payment would need to be made
to address that imbalance.  Even if the
imbalance only created a contingent liability and that contingency was never
triggered while Wapiti owned the interests, this does not change Petro-Hunt’s
obligations under the Purchase and Sale Agreement.

We overrule Petro-Hunt’s third issue.

Petro-Hunt argues in its fourth issue that the trial court
erred in assigning a value for the entire production imbalance based on the
value of gas on one day when the imbalance developed over a longer length of
time.  This matter was discussed extensively
at trial between Petro-Hunt’s attorney and Wapiti’s testifying expert, Kyle
Pearson.  The matter was best
encapsulated by a discussion of a hypothetical presented by Petro-Hunt’s
attorney.  In that hypothetical, in one
month there was an overproduction of gas of 100 MMBtus
when one MMBtu was valued at $1.  The next month, there was an underproduction
of gas of 50 MMBtus when one MMBtu
was valued at $2.  In the first month,
the value of Petro-Hunt’s overproduction would have been $100.  In the second month, the value of
Petro-Hunt’s underproduction would have been $100.  Petro-Hunt’s attorney argued that this meant
there was no overall loss.

Pearson disagreed. 
He testified that, regardless of how much money Petro-Hunt received or
lost due to the overproduction or underproduction, the critical inquiry is the
quantity of the overproduction and underproduction.  Based on quantity, a 50 MMBtu
overproduction imbalance would still exist, and that liability would be
transferred to Wapiti.  The fact that Petro-Hunt
did not suffer a net cash loss in this hypothetical would not mean that an
imbalance no longer exists.  

As Pearson explained, the overproduction imbalance was
transferred to Wapiti on June 1, 2001, the closing date for the Purchase and
Sale Agreement.  Because the imbalance
was transferred on that date, the value of the imbalance should have been
calculated based on the value of gas on that date.  Pearson testified that $3.70 per MMBtu was a reasonable and correct figure.

We hold that Pearson’s explanation is legally sufficient
to support the trial court’s determination that the value of the production
imbalance should have been based on the value of gas on the closing date.  Because Petro-Hunt does not provide any
support for why this determination is so against the great weight and
preponderance of the evidence that it is clearly wrong and unjust, we also hold
that it is factually sufficient.

We overrule Petro-Hunt’s fourth issue.

                                                                        
Bench Trial on Attorney’s Fees

In its fifth issue, Petro-Hunt argues the trial court
erred in awarding attorneys’ fees.

A.            
Standard of Review

We review a trial court’s determination of attorneys’ fees
for an abuse of discretion.  Ryan v. Abdel-Salam, 39
S.W.3d 332, 337 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).  In an appeal from a bench trial, we may “not
invade the fact-finding role of the trial court, who alone determines the
credibility of the witnesses, the weight to give their testimony, and whether
to accept or reject all or any part of that testimony.”  Volume Millwork, Inc. v. W. Hous. Airport Corp., 218 S.W.3d 722, 730 (Tex. App.—Houston [1st Dist.]
2006, pet. denied).

B.            
Analysis

“A person may recover reasonable attorney’s fees . . . in addition to the amount of a valid
claim and costs, if the claim is for . . . an oral or written
contract.”  Tex. Civ. Prac. & Rem. Code Ann.
§ 38.001(8) (Vernon 2008).  “If
attorney’s fees are proper under section 38.001(8), the trial court has no
discretion to deny them.”  Smith v. Patrick W.Y. Tam
Trust, 296 S.W.3d 545, 547 (Tex. 2009).

The reasonableness of an attorneys’ fee award generally
presents a question of fact.  See Ragsdale v. Progressive Voters League,
801 S.W.2d 880, 881–82 (Tex. 1990); Haden
v. David J. Sacks, P.C., 332 S.W.3d 503, 512 (Tex. App.—Houston [1st Dist.]
2009, pet. denied).  An award of
attorneys’ fees must be supported by evidence that the fees were both
reasonable and necessary.  See Stewart Title Guar. Co.
v. Sterling, 822 S.W.2d 1, 10 (Tex. 1991).  In reviewing an attorneys’ fee award for
excessiveness, we may draw upon our common knowledge as justices of the court
and our experience as lawyers and judges. 
C.M. Asfahl Agency v. Tensor, Inc., 135 S.W.3d 768, 802
(Tex. App.—Houston [1st Dist.] 2004, no pet.).

Petro-Hunt presents two main arguments for why the trial
court erred in granting the full amount of attorneys’ fees requested by
Wapiti.  First, Petro-Hunt argues that
Wapiti failed to segregate the attorneys’ fees incurred in prosecuting its
breach of contract claim from the attorneys’ fees incurred in prosecuting its
fraud claim.  Second, Petro-Hunt argues
that Wapiti failed to establish that its fees were reasonable and necessary.

1.             
Segregation

When a party presents multiple claims, some of which
support recovery of attorneys’ fees and some of which do not, the party must
segregate the attorneys’ fees attributable to claims for which fees are
recoverable.  Tony Gullo Motors I, L.P. v. Chapa, 212
S.W.3d 299, 310–11 (Tex. 2006).  While
attorneys’ fees are recoverable for a breach of contract claim, they are not
recoverable for a fraud claim.  Id. at 304.

When Wapiti filed suit in 2005, it asserted the breach of
contract claim that is the subject of this appeal.  In 2007, Wapiti amended its pleadings to add a
fraud claim.  When the parties appeared
for trial in 2010, Wapiti announced it was dropping its fraud claim.

Petro-Hunt argues that Wapiti’s evidence for attorneys’
fees on its breach of contract claim fails to segregate the fees incurred on
its fraud claim.  In making this
argument, Petro-Hunt fails to address the evidence submitted by Wapiti that
explicitly stated that the fees had been segregated.  

After Petro-Hunt objected to some of their evidence on
attorneys’ fees, including a complaint that Wapiti had failed to segregate its
attorneys’ fees, Wapiti filed a reply. 
The reply included a second affidavit from Wapiti’s lead attorney.  That affidavit explicitly states:

While a tort claim of fraud was initially included in the
complaint because it was conceivably intertwined in the same nexus of operating
facts as the contract claim, the tort claim was not pursued beyond the initial
actions of this case and the actions for this claim were previously eliminated
from the billings to Wapiti.  Billings for this tort claim are not
represented in this request to this Court. 
Moreover, any factual investigation or document review for this matter
would have directly dealt with the operative facts for the breach of contract
claim.

(Emphasis added.) 
We hold that this sworn statement is sufficient to establish that,
contrary to Petro-Hunt’s assertion, Wapiti had segregated its attorneys’ fees. 

2.             
Reasonable and Necessary

Factors that we consider in determining whether attorneys’
fees are reasonable include the following:

(1)     the time and labor required, the novelty and difficulty of
the questions involved, and the skill required to perform the legal service
properly;

(2)     the likelihood . . . that the acceptance of the
particular employment will preclude other employment by the lawyer;

(3)     the fee customarily charged in the locality for similar
legal services;

(4)     the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the
circumstances;

(6)     the nature and length of the professional relationship with
the client;

(7)     the experience, reputation, and ability of the lawyer or
lawyers performing the services; and

(8)     whether the fee is fixed or contingent on results obtained
or uncertainty of collection before the legal services have been rendered.

Arthur Andersen
& Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997) (quoting
Tex. Disciplinary Rules Prof’l Conduct R. 1.04, reprinted in Tex. Gov’t Code Ann. tit. 2, subtit.
G, app. A (Vernon Supp. 2011) (Tex.
State Bar R., art. X, § 9)).

 Petro-Hunt argues
that Wapiti failed to break out time charged to particular tasks.  While this was true for its evidence in its
initial briefing on attorneys’ fees to the court, Wapiti provided additional
evidence along with its reply to Petro-Hunt’s objections to their original
evidence.  This additional evidence
included an itemized and monthly breakout of the work performed by Wapiti’s
attorneys for this case.  Petro-Hunt did
not object to or otherwise address this additional evidence at trial or on
appeal.

Petro-Hunt acknowledges that Wapiti established that
Wapiti’s attorneys’ acceptance of work for Wapiti precluded them from providing
services to other clients or to Wapiti for other matters.  It asserts, however, that “nothing about this
engagement or its subject matter precluded Wapiti’s attorney from working for
any types or classes of clients or matters.” 
Petro-Hunt does not otherwise explain the significance of this
assertion.

Next, Petro-Hunt argues, “Although the hourly rates of
Wapiti’s counsel appear to be consistent with engagements of these types by
attorneys of the experience identified by Wapiti, the records provided by
Wapiti are insufficient to determine if the work performed by the various
attorneys at their respective billing rates is appropriate.”  Petro-Hunt’s proof for this assertion is the
affidavit of one of their attorneys.  The
affidavit was filed before Wapiti filed its reply, which included additional
evidence including an itemized and monthly breakout of the work performed by
Wapiti’s attorneys for this case. 
Petro-Hunt made no effort, at trial or on appeal, to explain how this
additional evidence is insufficient.

Petro-Hunt also argues that the fact that the amount of
attorneys’ fees awarded to Wapiti ($318,113) was equal to 75% of the actual
damages awarded to Wapiti ($424,811.80) should have caused the trial court to
reduce the fees awarded.  Attorneys’ fees
must bear some reasonable relationship to the amount in controversy.  USAA Cnty. Mut. Ins. Co. v. Cook, 241 S.W.3d 93, 103 (Tex. App.—Houston [1st Dist.] 2007, no pet.).  Even so, the amount of damages awarded is
only one factor in determining the reasonableness of a fee award. Id. 
The mere fact that attorneys’ fees meet or exceed the amount of damages
does not automatically establish that the fees are unreasonable.  See id.
at 98, 103 (upholding award of $23,310 in attorneys’
fees when amount of actual damages in judgment was $1,926.56); Bencon Mgmt. & Gen. Contracting, Inc. v.
Boyer, Inc., 178 S.W.3d 198, 209–10 (Tex. App.—Houston [14th Dist.] 2005,
no pet.) (upholding award of $282,000 in attorneys’
fees when amount of actual damages in judgment was $81,336.83).  While it is a factor to consider, simply
showing that the amount of attorneys’ fees awarded to Wapiti was equal to 75%
of the actual damages awarded to Wapiti does not, in itself, establish that
attorneys’ fees were not reasonable.

Petro-Hunt asserts that, before this case was initiated,
Wapiti’s counsel had litigated another case for Wapiti involving some of the
same matters.  Petro-Hunt argues that,
because this prior litigation would have allowed Wapiti’s attorneys’ to “ramp
up” before bringing this litigation, this “ramp up” should have caused the
trial court to reduce the fees awarded. 
Assuming without deciding that the prior litigation allowed Wapiti’s
attorneys’ to “ramp up” before bringing this suit, there is no proof that this
“ramp up” is not already reflected in the attorneys’ fees that were charged.

Finally, while Petro-Hunt acknowledges that Wapiti
presented evidence showing that it paid fees on an hourly basis, Petro-Hunt
complains that Wapiti failed to produce an attorneys’ fee agreement.  Petro-Hunt does not explain why this was
necessary or otherwise should have affected the trial court’s determination.

Based on the foregoing, the only pertinent matter that
Petro-Hunt has asserted on appeal concerning the reasonableness of the award of
attorneys’ fees is that the amount of attorneys’ fees awarded to Wapiti was
equal to 75% of the actual damages awarded to Wapiti.  As we have recognized above, this is only one
factor for the trial court to consider and does not, by itself, establish that
the award is unreasonable.  See Cook, 241 S.W.3d at 98, 103; Bencon Mgmt., 178 S.W.3d at 209–10.

We overrule Petro-Hunt’s fifth issue.

                                                                                                          
Conclusion

We affirm the judgment of the trial court.

 

 

                                                                      Laura
Carter Higley

                                                                      Justice


 

Panel consists of
Chief Justice Radack and Justices Higley and Brown.











[1]         As part of its first issue, Petro-Hunt
argues that the trial court could not have granted summary judgment because
Wapiti failed to establish that it sustained any loss or damage as the result
of the alleged breach.  Wapiti did not
move for summary judgment on damages, however. 
Accordingly this cannot be a ground for reversing the trial court’s
rendition of summary judgment on liability. 
See Tex. R. Civ. P. 166a(a) (allowing
parties to obtain summary judgment on liability and then try damages issues on
the merits); McAllister v. Samuels,
857 S.W.2d 768, 774 (Tex. App.—Houston [14th Dist.] 1993, no writ) (recognizing
same).